989 F.2d 1143
 INTEGON LIFE INSURANCE CORPORATION, Plaintiff-Appellant,
Cross-Appellee,
v.
Philip A. BROWNING, Jr., Pabgnes Hotels, Ltd., Browning
Associates, Ltd., and J.A. Jones, Jr.,
Defendants-Appellees, Cross-Appellants.
CHASTAIN PROPERTIES, INC., Philip A. Browning, Jr., Striton
Properties, Inc., Browning Associates, Ltd., Scufflegrit,
Ltd., Philip A. Browning and Associates, Inc.,
Plaintiffs-Counterclaim Defendants-Appellants-Cross-Appellees,
v.
The RESOLUTION TRUST CORPORATION, as Receiver of San Jacinto
Savings Association and as Receiver of San Jacinto Savings
Association, F.A., San Jac Mortgage Company,
Defendants-Counterclaim Plaintiffs-Appellees,
The Insurance Commissioner of the State of California, as
conservator of Pacific Standard Life Insurance
Company, Defendant-Counterclaim
Plaintiff-Third-Party
Plaintiff-Cross-
Appellant Appellee.
 Nos. 91-8753, 92-8071.
 United States Court of Appeals,
Eleventh Circuit.
 May 4, 1993.
 
 James Lee Paul, Russell Richard Grosse, Gambrell Clarke Anderson & Stolz, Atlanta, GA, for Browning, et al.
 Thomas M. Byrne, Dulaney Lee O'Roark, III, Sutherland Asbill & Brennan, Atlanta, GA, for Integon Life Ins. Corp., et al.
 J. Scott Jacobson, Robert F. Leverett, Holt Ney Zatcoff & Wasserman, Atlanta, GA, Jeffrey Ehrlich, Resolution Trust Corp., Washington, DC, for Resolution Trust Corp., et al.
 Steven J. Green, Dept. of Justice, State of Cal., Sacramento, CA, Richard M. Kirby, David M. Monde, Jones Day Reavis & Pogue, Atlanta, GA, for Pacific Standard, et al.
 Appeals from the United States District Court for the Northern District of Georgia.
 Before FAY and BIRCH, Circuit Judges, and KAUFMAN*, Senior District Judge.
 BIRCH, Circuit Judge:
 
 
 1
 This case is a consolidated appeal concerning a series of complex real estate transactions and the application of the anti-tying provisions of the Home Owners' Loan Act ("HOLA"), 12 U.S.C. § 1464(q), to those transactions. For the reasons set forth below, the district court's decisions are AFFIRMED IN PART and REVERSED IN PART.
 
 I. BACKGROUND
 A. The Transactions
 
 2
 The two primary parties in this appeal are Philip A. Browning ("Browning") and the Southmark Corporation ("Southmark"), although most of the transactions that are the subject of this case occurred between Browning-controlled entities and Southmark subsidiaries.[1]
 
 
 3
 Prior to 1986, Browning and other investors, through Chastain Properties, Ltd., owned property on Chastain Road in Cobb County, Georgia.[2] In early 1986, Browning decided to acquire his partners' interests in this investment, but needed financing to accomplish his plan. Shortly thereafter, Browning discussed possible financing with Southmark employees Arthur G. Weiss and Larry Ettner. At that time, Southmark's primary business was real estate investment.
 
 
 4
 According to Browning, Weiss stated that Southmark was generally not interested in making small loans, but that Southmark would be willing to make a loan (the "Chastain Loan") in the amount necessary for Browning to buy out his partners and also purchase a 109 acre tract of land adjoining the property owned by Chastain Properties, Ltd. Browning then contracted with his partners to acquire their interests in Chastain Properties, Ltd. and also contracted for the purchase of the 109 adjoining acres (collectively the "Chastain Property").
 
 
 5
 In late April, 1986, before the Chastain Loan closed, Weiss and Browning visited a 395 acre tract of land located on Scufflegrit Road in Cobb County, Georgia (the "Scufflegrit Property"). The Scufflegrit Property was owned by San Jac Mortgage Company ("San Jac Mortgage"), a Federal savings and loan association and a subsidiary of San Jacinto Savings Association ("San Jacinto Savings"), a subsidiary of Southmark. Weiss informed Browning that San Jac Mortgage was interested in selling the property and that Southmark would lend him the money for the purchase of the property. Browning asserts that Weiss also stated that unless Browning purchased the Scufflegrit Property, Southmark would not make the Chastain Loan.[3] Browning orally agreed to purchase the Scufflegrit property for $23 million.
 
 
 6
 On May 20, 1986, the Chastain Loan closed. San Jac Mortgage funded the loan, which totaled $11.2 million.[4] Browning used the loan proceeds to buy out his old partners and to purchase the 109 acre tract of land. At the closing Browning was represented by a large Atlanta law firm experienced in complex financial and real estate transactions.
 
 
 7
 The documentation evidencing the loan included a commitment, a loan agreement, a promissory note, and two security deeds. Article 6.17 of both deeds to secure debt stated:
 
 
 8
 The Loan Instruments constitute the entire understanding and agreement between Grantor [Browning] and Grantee [San Jac Mortgage Company] with respect to the transactions arising in connection with the Indebtedness and supersede all prior written or oral understandings and agreements between Grantor and Grantee with respect thereto. Grantor hereby acknowledges that, except as incorporated in writing in the Loan Instruments, there are not, and were not, and no persons are or were authorized by Grantee to make, any representations, understandings, stipulations, agreements or promises, whether oral or written.
 
 
 9
 R6-45 Ex. 1-8 (Appeal No. 91-8753). The security deeds defined "Loan Instruments" as the "Deed to Secure Debt, the Note, the Loan Agreement and any other instrument given to evidence, govern or further secure the Indebtedness, including without limitation, any guaranty of the Indebtedness or any part thereof." Id., Ex. 1-4. None of the Loan Instruments referred to the Scufflegrit Property or indicated that a condition to the receipt of the Chastain Loan was Browning's agreement to purchase the Scufflegrit Property.
 
 
 10
 Following the Chastain Loan closing, Weiss informed Browning that Southmark was interested in selling another tract of land located near Loop 120 and Interstate 75 in Cobb County, Georgia (the "Loop 120 Property"). After discussions, Browning orally committed to purchase the property for $5.3 million.
 
 
 11
 The closings for the Scufflegrit Property and the Loop 120 Property purchases were scheduled for June 30, 1986. Browning, however, needed a down payment of twenty percent on both properties. To satisfy that need, Browning and Southmark structured three loans that were secured by property that Browning already owned. Thus, Browning encumbered property he already owned in order to raise money to purchase the Scufflegrit and Loop 120 Properties.
 
 
 12
 The first of these down payment loans was a $1.8 million loan secured by Browning's property located on Bells Ferry Road in Cobb County, Georgia (the "Bells Ferry Property"). The loan was funded by Integon, a subsidiary of Southmark, and closed on June 27, 1986 (the "Bells Ferry Loan").[5] Browning executed a partial guaranty as part of the Bells Ferry Loan (the "Bells Ferry Guaranty"). Several months later, Integon assigned the loan and guaranty to Pacific Standard Life Insurance Company ("Pacific"), another Southmark subsidiary.[6]
 
 
 13
 The second down payment loan was a $2 million loan secured by the Kingsland Holiday Inn located in Kingsland, Georgia (the "Kingsland Property"). The loan was made by Southmark and closed on June 30, 1986.[7] At the closing, Integon executed a letter of intent to refinance the $2 million loan and to refinance the existing indebtedness on the Kingsland Property.
 
 
 14
 The third down payment loan was a $2.5 million loan secured by property located on Old Peachtree Road in Gwinnett County, Georgia (the "Old Peachtree Property"). The loan was made by Southmark and closed on June 30, 1986.[8] Again at this closing, Integon executed another letter of intent to refinance this loan. Integon subsequently fulfilled its letter of intent and refinanced the loan.
 
 
 15
 The closings for the Scufflegrit Property and the Loop 120 Property took place on June 30, 1986. Browning used the proceeds from the loans on the Bells Ferry Property, the Kingsland Property and the Old Peachtree Property to fund the down payments for both purchases. During the closings, Browning threatened to walk out if the terms of the purchase agreements were not altered to his liking. The terms were altered and the closings proceeded. Browning purchased the Scufflegrit Property for $23 million from San Jac Mortgage.[9] Browning paid $4.6 million as a down payment. The balance of $18.4 million was funded through a loan from San Jac Mortgage. Browning purchased the Loop 120 Property for $5.3 million from Southmark.[10] Browning paid $1.1 million as a down payment and obtained financing for the balance through Southmark. As part of the Loop 120 Property purchase agreement, Southmark agreed to repurchase the property if it proved to be undevelopable. Browning, subsequently, exercised his option and sold the Loop 120 Property back to Southmark in March, 1987.
 
 
 16
 On September 23, 1986, Integon refinanced the $2 million Kingsland Property loan in fulfillment of its letter of intent. The new loan totaled $6.825 million and was secured by the Kingsland Property (the "Kingsland Loan"). The loan proceeds were paid to Browning and evidenced by a promissory note.[11] Browning used approximately $5.3 million of the refinancing proceeds to satisfy the existing construction loan on the property. The balance of the refinancing loan was used to satisfy the initial Kingsland Property loan made by Southmark on June 30, 1986.[12] Browning also executed a partial guaranty of the loan (the "Kingsland Guaranty"). The guaranty was limited to 25 percent of the principal, 100 percent of all accrued interest and any collection costs.
 
 B. Procedural Developments
 
 17
 This appeal is a consolidation of two cases. The common issue concerns the alleged violation of the anti-tying provisions of HOLA arising from the tying of the Chastain Loan to the purchase of the Scufflegrit Property and the Loop 120 Property. Also at issue are the Bells Ferry Loan and the Kingsland Loan, two of the loans Browning used for the down payments on the Scufflegrit Property and the Loop 120 Property.
 
 1. Appeal No. 92-8071
 
 18
 Browning filed suit in Superior Court of Fulton County, Georgia, against Pacific, San Jacinto Savings, and San Jac Mortgage on February 5, 1990. Browning claimed that the three defendants violated the anti-tying provisions of HOLA and sought damages and injunctive relief. Browning alleged that the sale of the Scufflegrit Property and Loop 120 Property was illegally tied to the Chastain Loan. In part, the complaint specifically requested that Pacific be restrained from foreclosing on the Bells Ferry Property because the loan on the Bells Ferry Property was made in connection with the illegal tying arrangement.[13] The case was removed to federal district court. Thereafter, Pacific answered and counterclaimed. Pacific sought damages against Browning under the Bells Ferry Loan and the Bells Ferry Guaranty.
 
 
 19
 On March 27, 1991, the Resolution Trust Corporation ("RTC") was substituted as a party for San Jacinto Savings.[14] A few days later, Pacific filed notice that the California Insurance Commissioner had been appointed as Conservator of Pacific.[15]
 
 
 20
 On cross motions for summary judgment, the district court held that San Jacinto Savings and San Jac Mortgage were immune to Browning's HOLA claim under the D'Oench doctrine[16], but that Browning's claim against Pacific should proceed to trial. Both Pacific and Browning appeal this decision. The district court also granted Pacific summary judgment on its claim for damages under the Bells Ferry Loan and Bells Ferry Guaranty. Browning appeals this judgment.
 
 2. Appeal No. 91-8753
 
 21
 Contemporaneous with the action between Browning and Pacific, San Jacinto Savings, and San Jac Mortgage, a parallel action between Browning and Integon commenced. The subject matter of this litigation was the $6.825 million Kingsland Loan and the Kingsland Guaranty. On March 30, 1990, Integon filed suit in district court against Browning seeking the appointment of a receiver pending foreclosure on the Kingsland Property and damages against Browning under the Kingsland Guaranty. Browning responded and counterclaimed. Browning sought damages for a violation of the anti-tying provisions of HOLA and other relief with respect to the Kingsland Loan and the Kingsland Guaranty. Browning's HOLA claim was based on the theory that the down payment loans were part of the HOLA violation in which the Chastain Loan was conditioned upon the purchase of the Scufflegrit Property and the Loop 120 Property. The district court held that there were unresolved, material issues of fact concerning Browning's HOLA claim against Integon and denied Integon's motion for summary judgment. Integon now appeals that decision.[17]
 
 
 22
 By an order dated August 26, 1991, this court granted the parties the right to appeal the district court's orders.
 
 II. DISCUSSION
 
 23
 The appeals in this case are from either the district court's grant or denial of summary judgment. We independently review the grant or denial of summary judgment and determine whether any genuine issues of material fact exist. Fed.R.Civ.P. 56(c); Mercantile Bank & Trust Co. v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir.1985). We review the evidence and all factual inferences in the light most favorable to the party opposing the motion. Id.
 
 
 24
 A. Browning's HOLA Claim Against Integon and Pacific.
 
 
 25
 Browning's position before the district court was that the Chastain Loan was illegally conditioned upon the purchase of other property owned by Southmark, the Scufflegrit Property.[18] Browning also argued that the loans made by Southmark affiliates to fund Browning's down payments on the Scufflegrit Property and Loop 120 Property were part of this illegal tying.
 
 
 26
 Integon and Pacific raise several grounds on appeal in attacking the district court's decision to proceed to trial on Browning's HOLA claim. Integon and Pacific contend that there was no evidence to support Browning's claim because his testimony is inadmissible under the parol evidence rule. Further, Integon and Pacific argue that even if Browning's testimony is admissible, there was no violation of HOLA because the Scufflegrit Property purchase was not tied to the Chastain Loan. Pacific also claims that it cannot be liable for a violation of HOLA because it is only an affiliate of the savings association, San Jacinto Savings. Despite Integon's and Pacific's vigorous attack on the admissibility of Browning's testimony, we assume for the purposes of this opinion that the district court properly considered this evidence. Because of the resolution that follows, we also need not address Pacific's claim that affiliates of savings associations are not liable under HOLA.
 
 
 27
 The Home Owners' Loan Act of 1933, 12 U.S.C. § 1461 et seq., regulates the conduct of Federal savings and loan associations, also known as "thrifts". In 1982, Congress amended HOLA when it enacted the Thrift Institutions Restructuring Act of 1982, Title III, sec. 301 et seq. Pub.L. No. 97-320, 96 Stat. 1496 (1982) ("TIRA"). One of the purposes of TIRA was to loosen the restrictions placed on the lending activities of savings and loan associations by authorizing the associations "to engage in a broader range of lending and related investment activities." S.Rep. No. 97-536, 97th Cong.2d Sess., reprinted in 1982 U.S.C.C.A.N. 3054, 3067. As part of this easing of restrictions, Congress also acted to prevent associations from engaging in anti-competitive lending practices such as the tying of the receipt of one thrift service with the purchase of another service. A new section was added to HOLA stating:
 
 
 28
 (1) An association shall not in any manner extend credit, lease, or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement--
 
 
 29
 (A) that the customer shall obtain additional credit, property, or service from such association, or from any service corporation or affiliate of such association, other than a loan, discount, deposit, or trust service; ....
 
 12 U.S.C. § 1464(q).[19]
 
 30
 The Senate Report accompanying the enactment of this section states that "[t]his provision applies the anti-tying restrictions to Federal thrifts in a manner generally comparable to the anti-tie-in provision applicable to bank holding companies under the Bank Holding Company Act of 1956, as amended." S.Rep. No. 97-536, 97th Cong.2d Sess., reprinted in 1982 U.S.C.C.A.N. 3054, 3109. Further illuminating Congress's intent is the fact that the anti-tying provisions applicable to commercial banks through the Bank Holding Company Act ("BHCA") are nearly identical to those applicable to federal thrifts. See 12 U.S.C. § 1972(1).
 
 
 31
 The BHCA was in turn an extension to the field of commercial banking of the general principles of the Sherman Antitrust Act prohibiting anti-competitive tying arrangements. Parsons Steel, Inc. v. First Alabama Bank, 679 F.2d 242, 245 (11th Cir.1982); see Swerdloff v. Miami Nat'l Bank, 584 F.2d 54, 58-59 (5th Cir.1978) (in construing BHCA the anti-trust laws provide a helpful analogy). Therefore, in construing the anti-tying provisions of HOLA, it is appropriate to refer to anti-tying law as developed in both BHCA and anti-trust cases. See Sundance Land Corp. v. Community First Fed. Sav. & Loan Ass'n, 840 F.2d 653, 659 (9th Cir.1988).
 
 
 32
 Under anti-trust law, a tying arrangement is " 'an agreement by a party to sell one product [the "tying" product] but only on the condition that the buyer also purchases a different (or "tied") product.' " Tic-X-Press, Inc. v. Omni Promotions Co., 815 F.2d 1407, 1414 (11th Cir.1987), quoting Northern Pac. Ry. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). There are five elements in a anti-trust illegal tying claim: (1) two separate products, a "tying" or "desirable" product and a "tied" or "undesirable" product; (2) the buyer was in fact forced to buy the tied product to get the tying product; that is, a "tying"; (3) the seller possessed sufficient economic power in the tying product market to coerce the buyer's acceptance of the tied product; (4) an anti-competitive effect in the tied product market; and (5) the involvement of a not insubstantial amount of interstate commerce in the tied product market. Amey, Inc. v. Gulf Abstract & Title, Inc., 758 F.2d 1486, 1502-03 (11th Cir.1985), cert. denied, 475 U.S. 1107, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986); see also Tic-X-Press, 815 F.2d at 1414.
 
 
 33
 When Congress extended the anti-tying provisions of anti-trust law to commercial banking through the BHCA, it applied stricter anti-tying provisions than those that existed under general anti-trust law. Part of the legislative history of the BHCA states that:
 
 
 34
 tying arrangements involving a bank are made unlawful by this section without any showing of specific adverse effects on competition or other restraints of trade and without any showing of some degree of bank dominance or control over the tying product or service. Moreover, as individual tying arrangements may involve only relatively small amounts, the prohibitions of this section are applicable regardless of the amount of commerce involved.
 
 
 35
 S.Rep. No. 91-1084, 91st Cong., 2nd Sess., reprinted in 1970 U.S.C.C.A.N. 5519, 5558 (Supplementary Views of Edward W. Brooke). A plaintiff is not required to prove the last three elements of a anti-trust tying claim in order to establish a violation of the BHCA anti-tying provisions. Parsons Steel, 679 F.2d at 245; see Dibidale of Louisiana, Inc. v. American Bank & Trust Co., 916 F.2d 300, 304-05 (5th Cir.1990), amended, 941 F.2d 308 (5th Cir.1991). Therefore, a tying claim under the BHCA has two elements: (1) two separate products, a "tying" or "desirable" product and a "tied" or "undesirable" product; and (2) the buyer was in fact forced to buy the tied product to get the tying product; that is, a "tying".
 
 
 36
 As noted above, the 1982 amendments to HOLA extended the anti-tying provisions of the BHCA to federal thrifts. HOLA now contains the same statutory language of the BHCA anti-tying provisions, and the purpose of the two sections is the same. Accordingly, the elements of proof in a HOLA anti-tying claim parallel those required in a BHCA tying claim. The plaintiff must prove (1) that there were two products, a tied and tying products and (2) that the buyer was in fact forced to buy the tied product to get the tying product; that is, a "tying". These elements track the language of HOLA: "an association shall not in any manner extend credit ... on the condition or requirement--(A) that the customer shall obtain additional credit, property, or service from such association, or from any service corporation or affiliate of such association." 12 U.S.C. § 1464(q)(1). The statutory language of "condition or requirement" coincides with the second element in a HOLA claim; that the buyer was in fact forced to buy the tied product to obtain the tying product.
 
 
 37
 Browning, as plaintiff in the HOLA claim against Integon and Pacific, was thus required to prove that there were two products and that they were tied together. There is no question that there were two products, the Chastain Loan and the Scufflegrit Property. However, Integon and Pacific argue that the purchase of the Scufflegrit Property was not in fact a condition or requirement for receiving the Chastain Loan. In other words they contend that the loan and the purchase were not tied together.
 
 
 38
 As noted above, a tying occurs when the purchaser is forced to buy the tied product to obtain the tying product. Tic-X-Press, 815 F.2d at 1414. This point was emphasized in Tic-X-Press when we held that "the plaintiff must establish that the seller forced or coerced the buyer into purchasing the tied product." Id. at 1415. We have also found that "for a tie to exist a seller must withhold product A [the "tying" or "desirable" product] unless the buyer also selects product B [the "tied" or "undesirable" product]. T. Harris Young & Assocs., Inc. v. Marquette Electronics, Inc., 931 F.2d 816, 822 (11th Cir.) (applying anti-trust law), cert. denied, --- U.S. ----, 112 S.Ct. 658, 116 L.Ed.2d 749 (1991); see also Heatransfer Corp. v. Volkswagenwerk, A.G., 553 F.2d 964, 978 (5th Cir.1977) ("it must be shown that the purchaser was coerced into purchasing an unwanted product" to establish anti-trust tying violation), cert. denied, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978).
 
 
 39
 Therefore, to establish a tying in violation of HOLA, a plaintiff must prove that the thrift forced or coerced the plaintiff into purchasing the tied product. In this case, Browning must demonstrate that Southmark, acting through its affiliates San Jac Mortgage and San Jacinto Savings, forced him to purchase the Scufflegrit Property in order to secure the Chastain Loan. Only then will Browning have asserted a claim under HOLA against Integon and Pacific for the loans made to Browning that he used for the down payments on the Scufflegrit Property.[20]
 
 
 40
 Under the facts of this case, we conclude that Browning has not demonstrated that there was a genuine issue of material fact as to whether he was forced or coerced into purchasing the Scufflegrit Property in order to receive the Chastain Loan and, therefore, his tying claim against Integon and Pacific must fail. In early 1986, Browning approached Southmark in order to obtain a loan to purchase the Chastain Property. Weiss, acting on behalf of Southmark, initially agreed to make the loan, but later allegedly insisted that the Chastain Loan would be made only if Browning also purchased the Scufflegrit Property. Browning then orally agreed to purchase the Scufflegrit Property for $23 million. Accepting this allegation as true, Southmark was at this point attempting to tie the purchase of the Scufflegrit Property to the Chastain Property loan. However, the subsequent actions of Southmark foreclose Browning's claim that the two products were tied together.
 
 
 41
 On May 20, 1986, the Southmark subsidiary, San Jac Mortgage loaned Browning the money necessary to purchase the Chastain Property. At this point, Browning's agreement to purchase the Scufflegrit Property was still oral. Under Georgia law, a contract for the sale of land is only binding on the parties if it is in writing. O.C.G.A. § 13-5-30(4); Smith v. Wilkinson, 208 Ga. 489, 67 S.E.2d 698, 701 (1951). Further, there was no reference to the purchase of the Scufflegrit Property in the Chastain Loan documents. At all relevant times Browning was guided by the advice of capable counsel. Browning was, therefore, under no legal obligation to purchase the Scufflegrit Property at the time the Chastain Loan closed.
 
 
 42
 Browning's actions at closing demonstrate that he knew that he was under no obligation to purchase the Scufflegrit Property. In his deposition, Browning stated that at the closing for the purchase of the Scufflegrit and Loop 120 purchases on June 30, 1986, "I pitched a wild ... conniption fit over that [the Loop 120 contract] and a couple of things about the Scufflegrit deal." Browning Deposition, 174. He also stated that he was not prepared to close unless his demands were met and would "walk" if they were not. This is manifestly not the conduct of a man coerced into consummating the transaction.
 
 
 43
 Based on the sequence of events in this case, we must conclude that Browning was not forced or coerced into purchasing the Scufflegrit Property as a condition of obtaining the Chastain Loan. Southmark, despite Weiss's putative statement, allowed Browning to obtain the Chastain Loan, the desirable product, without requiring him to purchase the Scufflegrit Property, the undesirable product. The fact that Browning purchased the second tract, although he was under no obligation to do so, does not create a tying claim. This case may have been different if Browning had purchased or obligated himself to purchase the undesirable Scufflegrit Property either before or contemporaneously with the Chastain loan. See Dibidale, 916 F.2d at 306. He did not do so, and we will not penalize the defendants for Browning's voluntary actions.[21]
 
 
 44
 In conclusion, Browning failed to establish that there was a genuine issue of material fact as to whether he was forced or coerced into purchasing the Scufflegrit Property as a condition of obtaining the Chastain loan. Browning, therefore, failed to establish a tying claim under HOLA. The district court improperly denied Integon's and Pacific's motions for summary judgment.
 
 
 45
 Browning's reliance on Amerifirst Properties, Inc. v. FDIC, 880 F.2d 821 (5th Cir.1989), and Swerdloff v. Miami Nat'l Bank, 584 F.2d 54 (5th Cir.1978), is misplaced. In both cases, the Fifth Circuit held that when a bank attempts to create an illegal tying arrangement and then refuses to provide the tying or desirable product to the customer because the customer will not or cannot comply with the condition of the tie, the bank may be held liable under the BHCA. In those cases the customers were damaged when they did not receive the desirable product because of the tie. In the present case, however, Southmark did provide the desirable product to Browning without forcing Browning to comply with the condition of the tie.
 
 
 46
 B. Browning's HOLA Claim Against San Jacinto Savings and San Jac Mortgage
 
 
 47
 With respect to Browning's HOLA tying claim against San Jacinto Savings and San Jac Mortgage, the district court granted summary judgment to both defendants. As noted above, the RTC placed San Jacinto Savings into receivership during this litigation. The district court held that even if Browning was able to make out a HOLA claim against these two entities, both would be immune from liability under the D'Oench doctrine. The D'Oench doctrine acts to prohibit a private party (Browning) from enforcing against a federal deposit insurer (the RTC) any obligation not specifically memorialized in a written document such that the federal deposit insurer would be aware of the obligation when conducting an examination of the institution's records. Baumann v. Savers Fed. Sav. & Loan Ass'n, 934 F.2d 1506, 1515 (11th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1936, 118 L.Ed.2d 543 (1992). Since San Jacinto Savings had been placed into receivership by the RTC, and San Jac Mortgage was a wholly owned subsidiary of San Jacinto Savings, Browning's alleged oral agreement could not be asserted against either defendant.
 
 
 48
 We have held that Browning failed to establish a violation of the anti-tying provisions of HOLA under the facts of this case. We, therefore, do not address the application of the D'Oench doctrine to San Jacinto Savings and San Jac Mortgage. Because Browning has not asserted a viable HOLA claim, the district court's grant of summary judgment to San Jacinto Savings and San Jac Mortgage is affirmed.
 
 
 49
 C. Pacific's Guaranty Claim Against Browning
 
 
 50
 Browning appeals the district court's award of summary judgment to Pacific on Pacific's claim for damages under the Bells Ferry Guaranty. Browning contends that the district court improperly awarded summary judgment for three reasons: (1) neither Pacific nor the Commissioner introduced evidence that they owned an interest in the Bells Ferry Guaranty; (2) Pacific was not the real party in interest; and (3) the Bells Ferry Guaranty was not enforceable because it was part of the alleged illegal tying arrangement.
 
 
 51
 The Bells Ferry Loan was made by Integon and was one of three loans used by Browning to provide the down payments on the Scufflegrit Property and Loop 120 Property. Contemporaneous with the Bells Ferry Loan, Browning executed a partial guaranty. Several months after the Bells Ferry Loan and Guaranty were executed, Integon transferred both the loan and guaranty to Pacific. During proceedings before the district court, Pacific informed the court that the California Insurance Commissioner had been appointed as conservator of Pacific.
 
 
 52
 Browning first contends that there was no evidence that either Pacific or the Commissioner owned any interest in the Bells Ferry Loan. Browning, however, alleged in his complaint against Pacific that Pacific held the Bells Ferry Loan. Moreover, Pacific's assets administrator testified that he was "the custodian of records relating to certain loans held by the Insurance Commissioner as conservator for [Pacific] in the course of its regularly conducted business activity including the Bells Ferry Loan." R22-108-2 (Appeal No. 92-8071). Thus, the only evidence that was presented to the district court was that the Commissioner, as conservator of Pacific, owned the Bells Ferry Note.
 
 
 53
 Browning next argues that Pacific was not the real party in interest and, thus, it should not have been awarded summary judgment on the Bells Ferry Guaranty. Prior to the filing of Browning's complaint against Pacific, the Commissioner was appointed conservator of Pacific. In opposing Pacific's motion for summary judgment on the guaranty, Browning argued that Pacific was not the real party in interest. Pacific then filed with the court the affidavit of Edward L. Middleton, the manager for the conservator of Pacific. Middleton testified:
 
 
 54
 The Commissioner as conservator, through the staff of [Pacific], has been prosecuting [Pacific's] Counterclaim against Browning on behalf of the conservation estate of [Pacific] and its policyholders. I am authorized to state on behalf of the Conservator that the Conservator ratifies the bringing of the Counterclaim and agrees to be bound by the Court's determination of the Counterclaim.
 
 R22-110-3 (Appeal No. 92-8071)
 
 55
 Federal Rule of Civil Procedure 17(a) states in part:
 
 
 56
 No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by ... the real party in interest; and such ratification ... shall have the same effect as if the action had been commenced in the name of the real party in interest.
 
 
 57
 See Hess v. Eddy, 689 F.2d 977, 1980 (11th Cir.1982), cert. denied, 462 U.S. 1118, 103 S.Ct. 3085, 77 L.Ed.2d 1347 (1983). The district court, thus, properly found that the Commissioner ratified the action taken in Pacific's name and awarded summary judgment against Browning.
 
 
 58
 Finally, Browning argues that the Bells Ferry Guaranty is not enforceable because it was part of the alleged tying arrangement involving the Chastain Loan and the Scufflegrit Property. We have held, however, that Browning failed to create a genuine issue of material fact in his illegal tying claim under HOLA. Therefore, this defense to Pacific's enforcement of the Bells Ferry Guaranty must fail.
 
 
 59
 In conclusion, the district court properly awarded summary judgment to Pacific on its claim to enforce the Bells Ferry Guaranty.
 
 III. CONCLUSION
 
 60
 Browning failed to introduce evidence sufficient to create a genuine issue of material fact as to whether he was forced or coerced into purchasing the Scufflegrit Property as a condition to obtaining the Chastain Loan and, therefore, failed to establish a violation of the anti-tying provisions of HOLA. The district court, thus, improperly denied summary judgment to Integon and Pacific. Because there was no HOLA violation, Browning's HOLA claims against San Jacinto Savings and San Jac Mortgage also fail. Finally, Pacific was entitled to summary judgment in its claim against Browning under the Bells Ferry Guaranty. We AFFIRM in part and REVERSE in part.
 
 
 
 *
 Honorable Frank A. Kaufman, Senior U.S. District Judge for the District of Maryland, sitting by designation
 
 
 [1]
 For simplicity, we will refer to Browning as the party to a transaction even if the actual party was a Browning-controlled entity
 
 
 [2]
 Chastain Properties, Ltd. is a Georgia limited partnership whose general partners are Striton Properties, Inc. and Browning Associates, Ltd. Both entities are controlled by Browning and his family
 
 
 [3]
 This is the alleged violation of the anti-tying provisions of HOLA that is the subject of both appeals
 
 
 [4]
 San Jac Mortgage subsequently transferred the loan to San Jacinto Savings
 
 
 [5]
 The loan proceeds were paid to Browning and Browning Associates, Ltd., a Georgia limited partnership controlled by Browning and his family
 
 
 [6]
 This guaranty is the subject of the action between Pacific Standard and Browning
 
 
 [7]
 The loan proceeds were paid to Browning and PABGNES Hotels, Ltd. and Browning Associates, Ltd., two entities controlled by Browning
 
 
 [8]
 Browning was the sole recipient of this loan
 
 
 [9]
 The actual purchaser of the property was Scufflegrit, Ltd., a Georgia limited partnership controlled by Browning
 
 
 [10]
 The actual purchaser was Browning Associates, Ltd
 
 
 [11]
 The proceeds were actually paid to Browning, Browning Associates, Ltd. and PABGNES Hotels, Ltd
 
 
 [12]
 This is the loan that is the subject of the action between Integon and Browning
 
 
 [13]
 As noted above, the Bells Ferry loan was made by Integon and subsequently transferred from Integon to Pacific
 
 
 [14]
 We will continue to refer to San Jacinto Savings for simplicity
 
 
 [15]
 We will continue to refer to Pacific for simplicity
 
 
 [16]
 The D'Oench doctrine states that a federal deposit insurer is not bound by any obligation not specifically memorialized in a written document such that the insurer would be aware of the obligation when conducting an examination of the institution's records. Baumann v. Savers Fed. Sav. & Loan Ass'n, 934 F.2d 1506, 1515 (11th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1936, 118 L.Ed.2d 543 (1992)
 
 
 [17]
 The district court also awarded summary judgment to Integon on the Kingsland Guaranty. Browning initially appealed this decision, but the appeal was settled before oral argument. Browning has withdrawn this part of his appeal
 
 
 [18]
 Although Browning also argued that the Loop 120 Property was tied to the Chastain Loan, we reject this contention as the Loop 120 purchase was not discussed until after the Chastain Loan closed
 
 
 [19]
 This provision was amended in 1989, but no substantive changes were made to the provision relating to this action
 
 
 [20]
 We are aware that this holding arguably puts us into conflict with the language used by the Fifth Circuit in Dibidale, 916 F.2d at 306 ("To restrict the scope of [the BHCA] to tying arrangements in which a seller is literally forced to purchase or provide a tied product or service in order to obtain credit would vitiate that section's intended role...."). Our holding is, however, consistent with the language and legislative history of HOLA and our precedent. Furthermore, the facts in Dibidale are consistent with our decision. In Dibidale the thrift allegedly required a customer to purchase a tied product before obtaining a desired loan
 
 
 [21]
 Although the sequence of events in this case foreclose Browning's HOLA claim, this case points out the apparent, troublesome ease with which a HOLA claim may be alleged. While not necessary to the decision in this case, it would appear that something more than a naked and unsubstantiated allegation should be required to create an issue of material fact relative to whether the complaining party was coerced into purchasing the tied product or service. It should not be so easy for a defaulting borrower to create delay in the resolution of its liability. Any other construction of transactions, such as those in this case, would place in question the binding effect of time-tested contractual provisions upon which the banking and real estate industries have justifiably relied in ordering their affairs. Were we to permit the mere unsubstantiated allegation of an oral coercion to undermine the force and legal effect of language in transactional documentation created by competent attorneys in a give-and-take business situation, we would be inviting commercial chaos. This case is not one where an unsophisticated and uncounseled consumer is confronted with a preprinted document by a financial institution that he must execute in order to obtain a loan. A failure to distinguish between these contrasting scenarios invites an uncertainty in the commercial arena not at all contemplated, or, we believe, countenanced by Congress in enacting HOLA