**SOUTHTRUST CORPORATION,**
Plaintiff,

v.

**PLUS SYSTEM, INC., et al., Defendants.**

No. CV–93–P–2291–S.

United States District Court,
N.D. Alabama,
Southern Division.

Aug. 10, 1995.

Thad G. Long, Denise Avery Dodson, F.M. Haston, III, Bradley, Arant, Rose & White, Birmingham, AL, for plaintiff.

Warren B. Lightfoot, Sarah B. Jackson, Lightfoot, Franklin & White, Birmingham, AL, for Plus System Inc.

George G. Lynn, Maynard, Cooper & Gale, Birmingham, AL, for Alabama Network Inc.

## MEMORANDUM OPINION

POINTER, Chief Judge.

### INTRODUCTION

This matter is before the court to consider Plus System, Inc.'s ("Plus") motion for summary judgment. This case involves a claim by plaintiff, SouthTrust Corporation ("South-Trust"), that the defendants, Plus Systems, Inc., Alabama Network, Inc., ("Alert") and Southeast Switch, Inc., ("Honor") violated the Sherman Antitrust Act, causing plaintiff damages. The plaintiff alleges that the provision in its contract with the defendants prohibiting the levying of a surcharge for automated teller machine (ATM) transactions performed at SouthTrust ATMs by non-SouthTrust customers is unlawful price-fixing in violation of the antitrust laws. SouthTrust further asserts that Plus is illegally tying the availability of its trademark rights to the alleged price-fixing scheme. SouthTrust seeks treble damages and injunctive relief for the defendant's alleged antitrust violations and invoked this court's jurisdiction pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. SouthTrust also claims the defendants have violated Alabama's common-law and the Alabama Code §§ 8–10–3 and 6–5–60. Plus Systems, Inc. asserted a counterclaim against SouthTrust. The defendant's counterclaim is not addressed by this opinion.

The question presented by Plus' motion for summary judgment is whether SouthTrust's complaint, challenging the contractual re-

striction on surcharging, sufficiently alleges antitrust injury under Sections 4 and 16 of the Clayton Act, and, if so, whether the regulation should properly be analyzed as a per se restraint of trade or under the rule of reason. For the reasons set forth below, the court finds that the defendant Plus' motion for summary judgment is due to be granted.

## STANDARD FOR SUMMARY JUDGMENT

The basic principles governing summary judgment under Fed.R.Civ.P. 56 were clarified in the trilogy of cases decided by the Supreme Court in 1986: *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Summary judgment is proper if the evidence is so one-sided that one party must prevail as a matter of law. On a motion for summary judgment, the inferences to be drawn from the underlying facts contained in the materials submitted must be viewed in the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970). In deciding whether a party is entitled to summary judgment, the court uses the same standards and burdens of production and persuasion that would apply at a jury trial.

## FACTS

The following facts are either undisputed or are taken in the light most favorable to SouthTrust, the non-moving party:

Defendant, Plus Systems, Inc., is a corporation organized to administer a national network of automated teller machines. Defendant, Alabama Network, Inc., is a corporation organized to administer a state-wide ATM network in Alabama. Defendant, Southeast Switch, Inc., is a corporation organized to administer a regional ATM network in Florida and other southeastern states. Plaintiff, SouthTrust Corporation, is a registered bank holding company and corporation engaged in providing banking services to customers in Alabama, Florida, and other states and is a sponsored financial institution of the Plus network.

Plus, a joint venture comprised of licensed member financial institutions and VISA U.S.A. Inc., is one of two national networks providing ATM services. A hierarchical system exists in the ATM industry, with national networks in the top tier, regional and statewide networks in the intermediate tier, and local banking institutions in the third tier. Alert and Honor are members and licensees of Plus, and they in turn sponsor and sublicense other financial institutions' participation in the Plus network. South-Trust became a sponsored member and sublicensee of the Plus network in 1991, through Alert.

Licensed member financial institutions, including SouthTrust, issue plastic cards bearing federally registered "Plus marks," and any card bearing the Plus marks may be used at any ATM bearing the Plus marks anywhere in the United States and around the world. Cards bearing the Plus marks may be issued only by licensed member financial institutions. Such cards may be ATM cards—which access the consumer's demand deposit or checking account, allowing the consumer to withdraw cash, transfer funds, or obtain an account balance—or credit cards, which allow the consumer to obtain a cash advance against a line of credit.

Transactions performed by cardholders at their own bank's ATMs are called "on-us" transactions and are processed by the cardholder's bank without use of a shared ATM network. Transactions processed through the Plus network are three-party transactions involving a cardholder, an issuing bank (the bank that issued the ATM card to the cardholder), and an acquirer (the bank that owns the ATM at which the transaction is initiated). When a cardholder of a licensed member financial institution of the Plus network initiates a transaction at an ATM owned by another member institution, the transaction is called a "foreign transaction." A foreign transaction is routed through the Plus network and electronically processed, or "switched," by a large computer located at Plus' headquarters, unless the acquirer

chooses to route the transaction through another network of which it is a member.

When a cardholder initiates a transaction which is routed through the Plus network, the Plus "switch" obtains verification from the issuing bank of the sufficiency of cardholder funds, and, if authorization is received, the switch relays the authorization to the acquirer, which dispenses the cash to the consumer. Each day, the switch totals the transactions performed at member banks' ATMs and then "settles" the accounts of member banks by crediting and debiting the banks' accounts. For this electronic processing service, the issuing bank pays Plus a 5 (five) cent "switch fee" for each transaction. The issuing bank also pays the acquiring bank 50 (fifty) cents per transaction to offset costs incurred by the acquiring bank in providing ATM services.

Only banks that agree to abide by Plus' rules and regulations may become licensed to use the Plus marks. The rules apply only when the acquiring bank chooses to route the ATM transaction through the Plus switch. To participate in the Plus network, SouthTrust contracted with Alert "to be bound by the terms and conditions of the By–Laws and Operating Regulations" of Plus. Paragraph 2.3(I) of the Plus Operating Regulations provides the following restraint on sublicensees such as SouthTrust:

> To the extent not prohibited by applicable law or regulations, all Qualified ATMs must ... [n]ot permit a transaction fee to be added to the amount of the transaction, unless (i) it is a Local Transaction [the same institution issued the card as owned the ATM machine] or (ii) the transaction fee is imposed under color of a state law that renders unenforceable a PLUS rule proscribing the levying of such fees.

This regulation, referred to as the "no-surcharge rule," prohibits participants in the Plus network such as SouthTrust from making any extra charge on "foreign" transactions—those made by a consumer whose card was issued by another financial institution. It is this regulation which is primarily challenged by SouthTrust as violative of the antitrust laws.

SouthTrust's complaint alleges that Plus, Alert, and Honor have combined and conspired to fix the price for ATM services by restraining SouthTrust from surcharging for use of its ATMs, that SouthTrust does not have equal bargaining power with Alert, Honor, and Plus and was thus forced to accept the unreasonable price-fixing restrictions in order to participate in the benefits of the Plus system, and that the inevitable result of the restrictions on surcharging will be injury to consumers through deteriorating service and supply of ATMs. Notwithstanding SouthTrust's contract to abide by the Plus Operating Regulations, SouthTrust has been imposing surcharges on foreign transactions. SouthTrust also alleges in its first amended complaint that Plus is using its trademarks in an illegal tying arrangement by tying the availability of its trademark rights to the alleged price-fixing scheme.

## STANDING TO SUE

In determining whether a plaintiff has standing to bring an antitrust action, courts should first consider the relevant statutory language. *Consumer Product Safety Comm'n v. GTE Sylvania,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Section 4 of the Clayton Act broadly confers the right to sue for treble damages under the antitrust laws as follows:

> Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States ... and shall recover threefold the damages by him sustained, and the cost of the suit, including a reasonable attorney's fee.

15 U.S.C. § 15. Although the statute literally read would provide a remedy for every harm possibly caused by an antitrust violation, the Supreme Court has considered Congress' intent in enacting the original statutory language (as § 7 of the Sherman Act in 1890) and has concluded that the question whether a plaintiff has properly established "antitrust standing" cannot be determined simply by referring to the broad language of Section 4. *Associated Gen. Contractors v. California State Council of Carpenters,* 459

U.S. 519, 530, 103 S.Ct. 897, 904, 74 L.Ed.2d 723 (1982).

According to the Court, repeated references in the debates preceding the statute's enactment show Congress intended the Act to be construed by courts in conjunction with established common-law tradition, notably common-law rules circumscribing the availability of recoveries in both tort and contract litigation, such as foreseeability and proximate cause, directness of injury, certainty of damages, and privity of contract. *Id.* at 531–34, 103 S.Ct. at 904–06. Lower federal courts have been "virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Id.* at 534, 103 S.Ct. at 906 (quoting *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 262, n. 14, 92 S.Ct. 885, 891 n. 14, 31 L.Ed.2d 184 (1972)).

■ Therefore, instead of merely looking to the broad language of Section 4 to determine whether the plaintiff may recover for alleged antitrust injury, the Supreme Court said the question of whether a private plaintiff has antitrust standing requires lower courts to "evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." *Id.* at 535, 103 S.Ct. at 907.[1] Noting that a black-letter rule dictating a predictable result in every case was impossible to fashion, the Court identified a number of more specific factors to guide the courts in determining antitrust standing in specific circumstances. *Id.* at 536–37, 103 S.Ct. at 907–08. These factors include: (1) the causal connection between the antitrust violation and harm to the defendant; (2) the intent to cause harm; (3) the nature of the plaintiff's alleged injury; and (4) the directness or indirectness of the injury. *Id.* at 537–546, 103 S.Ct. at 908–13.

The most significant of these factors for the purposes of the present case is the nature of the plaintiff's alleged injury, and whether the injury is "of the type the anti-

trust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). The *Brunswick* case is one of the most important Supreme Court pronouncements on antitrust standing, in which the Court held that the antitrust laws should compensate only for those injuries the goals and purposes of the laws were intended to protect. For the following reasons, this court concludes that the plaintiff in this case has not alleged an "antitrust injury" sufficient to confer standing under Section 4 of the Clayton Act.

In a similar case, the Sixth Circuit held that a surcharge cap of five percent imposed by a firm that issued credit cards to truckers for use at participating truckstops was pro-consumer and was not the type of injury the antitrust laws were intended to remedy. *Tennessean Truckstop v. NTS, Inc.,* 875 F.2d 86, 90 (1989). In that case, the defendant operated a nationwide credit card system under which truckers could make purchases on credit at a number of participating truckstops. The defendant followed a policy of prohibiting the truckstops from imposing a surcharge of more than 5% on credit card purchases, and a truckstop which participated in the credit card system sued the defendant, alleging the surcharge limit constituted a conspiracy to fix prices. *Id.* The Sixth Circuit declined to find antitrust standing, reasoning that the fact that a particular competitor in a particular market has lost profits does not necessarily mean that competition as a whole is lessened. *Id.* at 88. The court emphasized that the plaintiff's interest in *Tennessean Truckstop* was not congruent with the interests of consumers generally, noting that "whenever the plaintiff and consumers have divergent rather than congruent interests, there is a potential problem in finding 'antitrust injury.'" *Id.* at 90 (quoting *Ball Memorial Hospital v. Mutual Hospital Ins.,* 784 F.2d 1325, 1334 (7th Cir.1986)).

---

1. This general balancing test articulated by the Court replaced earlier, more particularized tests for standing, the "target area" and "direct injury" tests. Justice Stevens noted in the *Associated General Contractors* case that the two tests often led to "contradictory and inconsistent results." *Associated Gen. Contractors v. California State Council of Carpenters,* 459 U.S. 519, 536, n. 33, 103 S.Ct. 897, 907 n. 33, 74 L.Ed.2d 723 (1983).

In another case with similar facts, the First Circuit rejected a Sherman Act challenge to Blue Shield's ban on doctors charging more than whatever Blue Shield determined to be the "usual and customary charge" for the services performed. *Kartell v. Blue Shield of Massachusetts*, 749 F.2d 922 (1st Cir.1984), *cert. denied*, 471 U.S. 1029, 105 S.Ct. 2040, 2049, 85 L.Ed.2d 322 (1985) A significant factor in the *Kartell* case was the fact that the prices at issue were low prices, not high prices. Justice Breyer, in the *Kartell* opinion, stated "[T]he Congress that enacted the Sherman Act saw it as a way of protecting consumers against prices that were too *high*, not too low." *Id.* at 931 (citing R. Bork, *The Antitrust Paradox* 61–62 (1978) (emphasis in original)).

■ This case is similar to *Tennessean Truckstop* and *Kartell.* The no-surcharge rule challenged by SouthTrust poses no identifiable threat of injury to competition. On the contrary, it enhances consumer welfare by limiting prices consumers will pay for ATM services and restricting the ability of acquiring banks to opportunistically profit in situations where consumers are less able to protect themselves.

SouthTrust contracted with Alert to join the Plus network to purchase ATM services for its customers. SouthTrust had several options. It could have chosen not to provide ATM services at all, to provide its own ATM services, or to contract with another ATM network for the service of switching ATM transactions. SouthTrust chose, however, to contract with Alert and to abide by the Plus Operating Regulations. Although SouthTrust wishes to complain now of the terms of the contract it entered, SouthTrust has suffered no cognizable "antitrust injury." As the Sixth Circuit reasoned in *Tennessean Truckstop*, the fact that a particular competitor, such as SouthTrust, has lost profits it might have gained in a particular market, does not necessarily mean that competition on the whole is lessened. The concern of the antitrust laws is the protection of the competitive process, not competitors. *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962).

The same analysis applies to SouthTrust's claim for injunctive relief. The statutory language of Section 16 of the Clayton Act authorizes injunctions for suits on behalf of private parties:

> Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws.

15 U.S.C. § 26. Although the *Brunswick* decision did not address actions in equity, the Supreme Court in *Cargill v. Monfort of Colo.*, 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986) held that antitrust injury was also a prerequisite for injunctive relief. According to the Supreme Court, "[i]t would be anomalous ... to authorize a private plaintiff to secure an injunction against a threatened injury for which he would not be entitled to compensation if the injury actually occurred." *Id.* at 112 n. 8, 107 S.Ct. at 490 n. 8.

## PER SE VERSUS RULE OF REASON ANALYSIS

■ The court concludes that the plaintiff has not suffered "antitrust injury" sufficient to have standing to assert a claim under the federal antitrust laws. Assuming arguendo that the plaintiff does have standing to bring the claim, however, summary judgment is still proper for the defendant because the regulation should be analyzed under the rule of reason, and, under such an analysis, the challenged regulation is not an illegal restraint of trade with a purpose only of stifling competition.

■ Section 1 of the Sherman Act provides:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

15 U.S.C. § 1. In enacting the Sherman Act, Congress used broad language to condemn any business agreement or contract which restrains trade. Taken literally, this language would prohibit any business agree-

ment, whether pro-competitive or not.[2] Two distinct rules have emerged for analyzing conduct under the Sherman Act, the per se rule and the rule of reason. For contracts or agreements to be deemed "per se illegal," they must be shown to have a "pernicious effect on competition and lack ... any redeeming virtue." *Northern Pac. Ry. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). A finding of per se illegality under the antitrust laws avoids the necessity of an investigation into the nature and history of the industry involved and a definition of the relevant market. *Id.* Practices found to be per se unlawful by the courts have included price fixing, division of markets, group boycotts, and tying arrangements. *Id.*

No bright line separates the per se from the rule of reason analysis. *NCAA v. Board of Regents*, 468 U.S. 85, 104 n. 26, 104 S.Ct. 2948, 2961 n. 26, 82 L.Ed.2d 70 (1984). The Supreme Court has generally held horizontal price fixing schemes to be per se illegal. *See, e.g., Jefferson Parish Hosp. Dist. v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984); *Arizona v. Maricopa County Medical Soc'y*, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982); *Catalano, Inc. v. Target Sales Inc.*, 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980). In *Broadcast Music, Inc. v. Columbia Broadcasting System (BMI)*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979), however, the Court declined to find that the defendants' practice of issuing blanket licenses to copyrighted music compositions constituted a per se violation, although the fees for the licenses were set by agreement between the defendants and did constitute literal price fixing. *BMI*, 441 U.S. at 8, 99 S.Ct. at 1556. The Court in *BMI* indicated that in determining whether to apply per se illegality or the rule of reason, the court should inquire "whether the purpose and effect of the practice threaten the proper operation of our predominantly free-market economy—whether the practice facially appears

to almost always restrict competition and decrease output—or instead is designed to increase economic efficiency and render markets more, rather than less, competitive." *BMI*, 441 U.S. at 19–20, 99 S.Ct. at 1562.

In *National Bancard Corp. (NaBanco) v. VISA U.S.A.*, 779 F.2d 592, 598–603 (11th Cir.1986), *cert. denied*, 479 U.S. 923, 107 S.Ct. 329, 93 L.Ed.2d 301 (1986), the Eleventh Circuit applied the *BMI* standard to a challenge to VISA's interchange fee and upheld the district court's finding that the interchange fee was likely to create economic efficiency and thus was properly analyzed under the rule of reason. The interchange fee challenged in *NaBanco* closely resembles the interchange fee and no-surcharge rule at issue in this case, and the reasoning of the Eleventh Circuit in *NaBanco* is controlling here. The court found in *NaBanco* that the VISA processing service exhibited characteristics of a joint venture, even if it technically was not a joint venture, because it had integrated some functions to develop a product—the VISA card—that could not have been produced by individual members of VISA. The court described the product offered by VISA as the rules and regulations that create a universal national payment system. *NaBanco* at 602 n. 17. Plus, a network service providing processing of ATM transactions, closely resembles VISA and is likewise suggestive of a joint enterprise. Plus offers a similar service of national "switching" of ATM transactions which could not be offered by the member financial institutions alone.

In a price fixing case subsequent to *BMI*, the Supreme Court declined to apply the rule of reason, leaving somewhat unclear the standard in future price fixing antitrust challenges. In *Arizona v. Maricopa County Medical Soc'y*, 457 U.S. 332, 343, 102 S.Ct. 2466, 2472, 73 L.Ed.2d 48 (1982), the Court held that agreements among competing physicians setting the maximum fees they could

**2.** As Justice Brandeis stated:

The legality of an agreement or regulation cannot be determined by so simple a test, as whether it restrains competition. Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the

restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. *Bd. of Trade of the City of Chicago v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 243–44, 62 L.Ed. 683 (1918).

claim in full payment for health services was a per se violation of the antitrust laws. The Supreme Court in *Maricopa,* however, emphasized that the combinations were composed of individual practitioners who competed with one another for patients. Their combination did not permit them to offer a different product, but merely to sell their services at a fixed price, affecting the prevailing market price of medical care. *Id.* at 356, 102 S.Ct. at 2479. The Court noted that the foundations were not analogous to partnerships or joint ventures. *Id.*

The challenged practice in this case—the interchange fee and the no-surcharge rule—more closely resemble the blanket-license arrangement in *BMI* and the interchange fee in *NaBanco* than the foundation's price fixing challenged in *Maricopa,* and the practice should therefore not be deemed per se illegal, but instead should be evaluated under the rule of reason. The challenged practice in this case is designed to increase economic efficiency and render markets more, rather than less, competitive, and thus, should be analyzed under the rule of reason, as the Court instructed in *BMI.*

■ The primary inquiry under a rule of reason analysis is whether, under the circumstances, the challenged restraint is "unreasonably restrictive of competitive conditions." *Standard Oil Co. v. United States,* 221 U.S. 1, 65, 31 S.Ct. 502, 515, 55 L.Ed. 619 (1911). Essentially, the question is whether the challenged restraint is one that promotes competition or one that suppresses competition. While analysis of a challenged practice under the rule of reason generally requires an "elaborate inquiry into the reasonableness of a challenged business practice," *Maricopa,* 457 U.S. at 343, 102 S.Ct. at 2472, the court in this case finds sufficient evidence has been introduced to determine that the challenged practice is clearly pro-competitive.

■ Whether the court in applying the rule of reason must weigh the market power of an antitrust defendant is uncertain. *NaBanco* at 603 & n. 19 (citing cases for both sides of the proposition). In *NaBanco,* the district court found that weighing the relevant market was a valid analytic device. *Id.* at 604. Although the plaintiff in *NaBanco* argued that only VISA card transactions constituted the relevant market, the Eleventh Circuit upheld the district court's finding that the relevant market consisted of all nationwide payment services used in retail sales, including "VISA, Mastercard, T & E cards, merchants' proprietary cards, merchants' open book credit, cash, travelers cheques, ATM cards, personal checks and check guarantee cards." *National Bancard Corp. (NaBanco) v. VISA U.S.A.,* 596 F.Supp. 1231, 1259, *aff'd, NaBanco,* 779 F.2d 592 (11th Cir.1986). The same reasoning applies in the present case, and the relevant market in this case is thus all payment systems. Consumers can easily shift to using personal checks, credit cards, or obtaining cash by means other than ATMs. Since the relevant market in the present case then includes all payment devices, Plus clearly does not have market power in the market so defined.

In *NaBanco,* the Eleventh Circuit upheld the lower court's finding that even if VISA had market power in the relevant market, the interchange fee was procompetitive, and thus not illegal under a rule of reason analysis. *NaBanco,* 779 F.2d 592, 605. The court in *NaBanco* accepted VISA's argument that the credit card processing service was a joint venture-type enterprise in which the interchange fee acted as an internal control mechanism that yielded procompetitive efficiencies that its members could not create acting alone. *NaBanco,* at 604. The same analysis applies here. The no-surcharge rule challenged in the present case creates similar economic efficiencies. There must be an advance agreement—a system-wide rule governing payment for network transactions—in order to have a system. The joint venturers who join to create the network agree in advance on the pricing of the system and the revenues' distribution in order to lend stability to the system. The no-surcharge rule creates price certainty, so that customers do not have to spend large amounts of time seeking the lowest fee for an ATM transaction.

The no-surcharge rule enhances consumer welfare. Many transactions are likely to be routed over switches owned by the bank itself or statewide or regional switches. The

Plus network switches a small number of transactions, when there is no other common network shared by the cardholder and the ATM. Plus' transactions are therefore likely to be made by travelers far from home, who are most vulnerable to opportunistic pricing. The court concludes that the net effect of the Plus rules and regulations, including the no-surcharge rule, is procompetitive, and, therefore, the challenged practice is upheld under the rule of reason analysis.

## TYING CLAIM

SouthTrust also alleges that Plus illegally tied adherence to its no-surcharge rule to the licensing of its trademarks. The first element of a tying claim is two separate products, a tying or desirable product and a tied or undesirable product. *Integon Life Ins. Corp. v. Browning,* 989 F.2d 1143, 1150 (11th Cir.1993). There must be two distinct markets for the products that are distinguishable in the eyes of buyers. *Jefferson Parish Hospital Dist. No. 2 v. Hyde,* 466 U.S. 2, 19, 104 S.Ct. 1551, 1562, 80 L.Ed.2d 2 (1984). In this case, the trademark is not analytically distinct from the tied product. The trademark—the Plus marks—serves only to identify the tied product—the ATM services—and the two products are not separate items for tie-in purposes. *See Krehl v. Baskin–Robbins Ice Cream Co.,* 664 F.2d 1348, 1354 (9th Cir.1982). Since the element of two separate products has not been established, SouthTrust's tying claim fails as a matter of law.

## ALABAMA STATE LAW CLAIMS

SouthTrust has asserted claims against Plus under Alabama Code §§ 8–10–1 and 8–10–3. Section 8–10–1 provides that persons who engage or agree with other persons to regulate or fix the price of articles or commodities shall be liable. The ATM services challenged in the present case are not articles or commodities, and thus do not fall within the ambit of § 8–10–1. Section 8–10–3 provides in part that persons or corporations which restrain the freedom of trade or production, or attempt to destroy competition shall be liable. According to this court's analysis, *supra,* that Plus does not have suffi-cient market power and that the challenged restraint is ultimately pro-competitive, SouthTrust's claim that the regulations violate § 8–10–3 also fail as a matter of law.

## CONCLUSION

The court hereby GRANTS summary judgment for the defendant, Plus Systems, Inc. on all of the plaintiff's claims. This opinion does not address the remaining counterclaim, however, which was not placed at issue by the defendant's motion for summary judgment.