The TENNESSEAN TRUCKSTOP, INC., Plaintiff–Appellant,

v.

NTS, INC., Defendant–Appellee.

No. 87–6016.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 12, 1988.
Decided May 19, 1989.

---

Richard J. Braun (argued), Thompson and Bussart, Nashville, Tenn., for plaintiff-appellant.

George E. Copple, Jr., Waller, Lansden, Dortch and Davis, Nashville, Tenn., Lewis A. Noonberg (argued), Piper & Marbury, Eric Barnett Miller, Baltimore, Md., for defendant-appellee.

Before KEITH and NELSON, Circuit Judges, and DUGGAN, District Judge.*

DAVID A. NELSON, Circuit Judge.

This is an appeal from the dismissal of a complaint alleging that the defendant, a firm that issues credit cards to truckers for use at participating truckstops, violated federal antitrust law by prohibiting the plaintiff truckstop from exacting a surcharge of more than five percent on purchases made with defendant's credit cards. We conclude that the plaintiff has alleged no injury of the sort that the antitrust laws were designed to redress, and we shall affirm the judgment of dismissal.

### I

The plaintiff, Tennessean Truckstop, Inc., is a Tennessee corporation that sells petroleum products, food, lodging and repair services to truckers and motorists. Tennessean's principal place of business is a truckstop located in Cornersville, Tennessee, at Interstate Highway 65.

The defendant, NTS, Inc., is a Texas corporation that operates a nationwide credit card system under which truckers can make purchases on credit at any of a number of participating independent truckstops. The truckstops enter into contracts with NTS committing them to honor NTS cards presented by carriers enrolled in the system. NTS pays participating truckstops directly on all NTS credit card invoices, whether or not the enrolled carriers honor their obligations to NTS.

Since 1982 NTS has followed a policy of prohibiting truckstops from charging NTS credit card users more than 105% of the prices paid by the truckstops' cash customers. Because it refused to adhere to this cap on credit card surcharges, Tennessean's status as a participating truckstop was terminated and Tennessean's name was removed from the NTS truckstop directory. NTS cards may no longer be used to make purchases at Tennessean, although NTS cardholders remain free, of course, to make purchases there using cash or any other credit card honored by Tennessean.

Tennessean sued NTS in federal district court under Section 1 of the Sherman Act, 15 U.S.C. § 1. The complaint alleged the existence of "a combination and conspiracy in unreasonable restraint of ... interstate trade and commerce in the sale of motor and diesel fuels in the Middle Tennessee area and elsewhere...." This alleged combination and conspiracy was said to consist of

"a continuing agreement, understanding and concert of action among the defendant and co-conspirators the substantial terms of which have been to fix and stabilize the price of motor and diesel fuel in the Middle Tennessee area and elsewhere by limiting the credit card price of motor and diesel fuel to no more than 105% of the cash price for sales of motor and diesel fuel."

The effects the agreed limit were alleged to have included the following:

"(a) Price competition in the sale of motor and diesel fuel in the Middle Tennessee area and elsewhere has been restrained and suppressed.

"(b) Plaintiff and other truckstops have been deprived of the opportunity to sell motor and diesel fuels in an open and competitive market; and

(c) Competition generally between truckstop operators, including plaintiff, has been restrained and suppressed."

---

* The Honorable Patrick Duggan, United States District Judge for the Eastern District of Michigan, sitting by designation.

Tennessean sought treble damages under Section 4 of the Clayton Act (15 U.S.C. § 15) and injunctive relief under Section 16 of the Clayton Act (15 U.S.C. § 26). Tennessean also sought damages under a Tennessee antitrust statute, Tenn.Code Ann. § 47–25–101.

NTS moved to dismiss the complaint under Rule 12(b)(6), Fed.R.Civ.P. The district court (Thomas A. Wiseman, Jr., C.J.) granted the motion to dismiss, holding that the plaintiff lacked antitrust standing under Section 4 of the Clayton Act, 15 U.S.C. § 15. The state antitrust claim was dismissed as a matter of discretion. The latter ruling has not been assigned as error on appeal; the question presented to us is whether the district court erred in dismissing the Sherman Act claim.

## II

In *Associated General Contractors v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), the Supreme Court identified several factors that are to be considered in determining whether a private plaintiff has standing to sue under the antitrust laws. The most significant of these factors, for our purposes, is the nature of the alleged injury—"whether it is of the type that the antitrust statute was intended to forestall." *Id.* at 540, 103 S.Ct. at 909. See *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Given the nature of the evils at which the Sherman Act was directed, both *Associated General Contractors* and another recent antitrust standing opinion, *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), have been read as teaching that the antitrust plaintiff "must show (1) that the alleged violation tends to reduce competition in some market and (2) that the plaintiff's injury would result from a decrease in that competition rather than from some other consequence of the defendant's actions." P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 334.1b at 299 (1988 Supp.).

## III

▮ Like the district court, we think that the plaintiff in the case at bar has not alleged an "antitrust injury" sufficient to confer standing under Section 4 of the Clayton Act. The plaintiff is not, in truth, complaining of a reduction in overall competition in middle Tennessee or elsewhere; the plaintiff does not and cannot, on the facts stated in the complaint, allege an injury of the type the Sherman Act was intended to forestall.

If NTS had not terminated its connection with Tennessean, to be sure, Tennessean might have enjoyed more business than it now receives from truckers belonging to the NTS system. But this does not necessarily constitute an antitrust injury; the fact that a particular competitor in a particular market has lost profits does not inevitably mean that competition as a whole is lessened. "The Antitrust laws ... were enacted for the 'protection of *competition*, not *competitors.*'" *Brunswick,* 429 U.S. at 488, 97 S.Ct. at 697, *quoting Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962) (emphasis in original).

Tennessean argues that by prohibiting member firms from imposing a surcharge of more than 5% on credit card purchases, NTS is engaging in a form of price-fixing that has been held to be anti-competitive. The principal case relied on in this connection is *Mandeville Island Farms v. American Crystal Sugar Co.,* 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948), where a group of sugar refiners had agreed among themselves to pay a uniform price for northern California sugar beets. Because the refiners controlled the only real market for northern California sugar beets, growers of beets in that area faced the choice of selling at the new price or going out of business. The Court held that even though the price-fixing was by purchasers rather than sellers, the agreement was "the sort of combination condemned by the [Sherman] Act...." *Id.* at 235, 68 S.Ct. at 1005. See also *United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed.

1129 (1940) (horizontal price-fixing by buyers held *per se* illegal).

Plaintiff also relies upon *National Macaroni Manufacturers Association v. Federal Trade Commission*, 345 F.2d 421 (7th Cir.1965). That case involved an agreement by an association of macaroni manufacturers, representing 70 percent of domestic macaroni production, to reduce the price of durum wheat at a time of shortage by limiting the amount of that commodity used in making macaroni. The Seventh Circuit held that when the manufacturers agreed "to fix the composition of their product with the design and result of depressing the price of an essential raw material, they violate[d] the rule against price-fixing agreements as it has been laid down by the Supreme Court." *Id.* at 426. Although the policy of the manufacturers' association was held to be *per se* illegal, the court did note in passing that the FTC order that was being approved by the court "did not hold 'that all effort at product standardization, or all buying agencies or other cooperative buying arrangements, or all attempts to cope with scarcity or other conditions of economic dislocation, are unlawful under the antitrust laws.'" *Id.* at 427.

Any such holding by the F.T.C. would have been in conflict with that agency's decision in *In re Associated Greeting Card Distributors*, 50 FTC 631 (1954). There the F.T.C. dismissed a complaint brought against an association of wholesale distributors that were alleged to have used their combined purchasing power to obtain favorable prices on greeting cards and related products. The F.T.C. emphasized that the association members, whose total annual sales amounted to only $3 million, did not occupy a dominant position in an industry that had sales of around $250 million annually. *Id.* at 632. See also *G & P Amusement Co. v. Regent Theater Co.*, 107 F.Supp. 453 (N.D. Ohio 1952) (holding that a cooperative representing theater owners in procurement of films from distributors did not violate federal antitrust laws).

The most significant court decision of this type was handed down in a case brought by a plaintiff whose name (Kartell) sounds as though it had been invented by some whimsical law professor for an examination question. In that case, *Kartell v. Blue Shield of Massachusetts, Inc.*, 749 F.2d 922 (1st Cir.1984), *cert. denied*, 471 U.S. 1029, 105 S.Ct. 2040, 2049, 85 L.Ed.2d 322 (1985), the First Circuit rejected a Sherman Act challenge to Blue Shield's "ban on balance billing." Blue Shield—which, with its Blue Cross affiliate, wrote about 74% of the private health insurance coverage in Massachusetts—followed a policy of paying doctors for treating patients insured by it only if the doctors promised not to make any additional charge to the patients. The doctors (who were under "heavy economic pressure" to participate) had to enter into agreements with Blue Shield in which they committed themselves in advance to accept as payment in full whatever Blue Shield determined to be the "usual and customary charge" for the services performed.

Holding that the district court erred as a matter of law in finding an unreasonable restraint of trade, the Court of Appeals, speaking through Judge Breyer, said this:

"To find an unlawful restraint, one would have to look at Blue Shield as if it were a 'third force,' intervening in the marketplace in a manner that prevents willing buyers and sellers from independently coming together to strike price quality bargains. Antitrust law typically frowns upon behavior that impedes the striking of such independent bargains. The persuasive power of the district court's analysis disappears, however, once one looks at Blue Shield, not as an inhibitory 'third force,' but as itself the purchaser of the doctor's services. [Citation omitted.] Antitrust law rarely stops the buyer of a service from trying to determine the price or characteristics of the product that will be sold. Thus, the more closely Blue Shield's activities resemble, in essence, those of a purchaser, the less likely that they are unlawful."

\*　　\*　　\*　　\*　　\*　　\*

"Once one accepts the fact that, from a commercial perspective, Blue Shield in essence 'buys' medical services for the account of others, the reasoning underlying the Second, Third, and Seventh Circuit view [*Medical Arts Pharmacy of Stamford, Inc. v. Blue Cross & Blue Shield of Connecticut, Inc.*, 675 F.2d 502 (2d Cir.1982); *Travelers Insurance Co. v. Blue Cross of Western Pennsylvania*, 481 F.2d 80 (3d Cir.), *cert. denied*, 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550 (1973); *Quality Auto Body, Inc. v. Allstate Insurance Co.*, 660 F.2d 1195 (7th Cir.1981), *cert. denied*, 455 U.S. 1020, 102 S.Ct. 1717, 72 L.Ed.2d 138 (1982)] indicates that the ban on balance billing is permissible."

*Id.* at 924–25.

The *Kartell* opinion distinguished *Mandeville Island Farms, National Macaroni*, and *Socony–Vacuum* as "cases in which the buyer was typically a 'sham' organization seeking only to combine otherwise independent buyers in order to suppress their otherwise competitive instinct to bid up price." *Id.* at 925. Blue Shield, by contrast, existed for a legitimate business purpose, namely the provision of medical insurance. The court also mentioned as a significant factor that the prices at issue were low prices, not high prices: "[T]he Congress that enacted the Sherman Act saw it as a way of protecting consumers against prices that were too *high*, not too low." *Id.* at 931, *citing* R. Bork, *The Antitrust Paradox* 61–62 (1978).

A provider of health insurance belongs to a different economic genus than a provider of credit card services, perhaps, but from an economic standpoint the functions they perform are similar. NTS pays truck stops for gasoline, just as Blue Shield pays doctors for medical services. The fact that NTS—which bears the credit risk—expects to be paid by the end user does not make it a "sham" organization, any more than the fact that Blue Shield is paid by its subscribers makes Blue Shield a "sham" organization. If individual truckers had refused to purchase goods on credit for more than 105% of the cash price, the truckers would merely have been exercising their right,

inherent in a free market, to reject a bad bargain. The fact that NTS is doing the bargaining for them does not alter matters, even if NTS has market power and individual truckers, acting atomistically, do not. See *Kartell*, 749 F.2d at 928 ("Blue Shield obtained prices that reflected its market power....[I]f Blue Shield had simply purchased those services for itself, the prices paid, in and of themselves, would not have amounted to a violation of the antitrust laws.").

Two other considerations bolster our conclusion that Tennessean suffered no "antitrust injury." First, NTS merely sought to limit the differential between the prices quoted to its customers and the prices quoted to customers paying cash; NTS (unlike Blue Shield in the First Circuit case) is not alleged to have made any attempt to influence the base price. In this respect the present case is a stronger one for the defendant than *Kartell* was. Second, the interest of Tennessean is not congruent with the interests of consumers generally. "Whenever the plaintiff and consumers have divergent rather than congruent interests, there is a potential problem in finding 'antitrust injury.'" *Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance, Inc.*, 784 F.2d 1325, 1334 (7th Cir.1986). The credit card surcharge cap is obviously a proconsumer device, and if it has cost Tennessean some profit, the "injury" is not "of the type the antitrust laws were intended to prevent." *Brunswick*, 429 U.S. at 489, 97 S.Ct. at 697. "Competition is a ruthless process ... and the antitrust laws are not balm for rivals' wounds." *Ball Memorial Hospital*, 784 F.2d at 1338.

■ Finally, Tennessean argues that it should be accorded standing so that it may investigate, through discovery, an asserted conspiracy between Texaco, Inc., and NTS. (According to Tennessean's brief, NTS administers Texaco's truck card program as well as its own.) The complaint itself does not mention the NTS–Texaco connection. No antitrust injury having been alleged in the complaint as filed, we are not prepared to pretend that it has been. Like the dis-

trict court, we express no opinion as to the legality or illegality of any agreement between Texaco and defendant—and the dismissal of the claim that was pleaded would not bar a new action asserting a totally different claim.

The dismissal of the complaint does mean that there will be no discovery as to the credit card surcharge cap; but no such discovery is needed. Sometimes, as in the *Brunswick* case, it is not until after a full-blown trial that there is determined to have been no antitrust injury. If this determination can be made with confidence on the basis of the complaint, it is better to cut the string before the substantial costs of litigating an antitrust case have been incurred.

The judgment of the district court is AFFIRMED.