BAUM RESEARCH AND DEVELOPMENT CO., INC., a Michigan corporation; and Steve Baum, an individual, Plaintiffs,

v.

HILLERICH & BRADSBY CO., INC., a Kentucky corporation; Easton Sports, Inc., a California corporation; Worth, Inc., a Tennessee corporation; National Collegiate Athletic Association, a Kansas non-profit educational organization; and Sporting Goods Manufacturers Association, a Florida not-for-profit corporation, Defendants.

No. 98–72946.

United States District Court,
E.D. Michigan,
Southern Division.

Nov. 19, 1998.

Salvatore A. Romano, Washington, DC, and David L. Nelson, Southfield, MI, for plaintiffs.

David A. Ettinger, Detroit, MI, for Easton Sports, Inc.

Barbara Goldman, Bloomfield Hills, MI, for Hillerich & Bradsby Co., Inc.

Dennis Barnes, Detroit, MI, for Worth, Inc.

Gregory L. Curtner, Ann Arbor, MI, for National Collegiate Athletic Association.

Joseph James Shannon, Detroit, MI, for Sporting Goods Manufacturers Association.

## OPINION

COHN, District Judge.

## TABLE OF CONTENTS

I.   Introduction ...................................................1018

II.  The Complaint ..................................................1018
     A.   Antitrust Claims ..........................................1019
          1.   Relevant Market and Parties .............................1019
          2.   NCAA Rules ...........................................1019
          3.   The Conspiracy .......................................1019
          4.   Theory of Case .......................................1020
     B.   Tort Claims ...............................................1020

III. Analysis .......................................................1020
     A.   Standard of Review .......................................1020
     B.   Antitrust Injury ..........................................1021
          1.   Anticompetitive Effect ...............................1022
          2.   Necessary predicate ..................................1023
     C.   Tort Claims ...............................................1024
          1.   Interference with Contractual Relations .................1024
          2.   Interference with Prospective Business Advantage .........1025

IV.  Conclusion .....................................................1025

---

If a man write a better book, preach a better sermon, or make a better mousetrap than his neighbour, tho' he build his house in the woods, the world will make a beaten path to his door.

    Ralph Waldo Emerson

### I.  Introduction

This is an antitrust case. Plaintiffs Baum Research and Development Company and Steve Baum (collectively referred to as "Baum"), are suing defendants National Collegiate Athletic Association (NCAA), baseball bat manufacturers Hillerich & Bradsby Co. (H & B), Easton Sports, Inc. (Easton), Worth, Inc. (Worth) (collectively referred to as "bat manufacturers"), and Sporting Goods Manufacturers Association (SGMA) for violating federal and state antitrust laws and for committing state-law torts. The gravamen of Baum's complaint is that the bat manufacturers have conspired with the NCAA to manipulate the standard for baseball bats used in NCAA-sanctioned baseball games to perpetuate their dominance and exclude Baum from the market for baseball bats used in amateur baseball.

Before the Court are defendants' motions to dismiss the complaint pursuant to Fed. R.Civ.P. 12(b)(6). Among other things, each of the defendants argue that the injury Baum claims is not an "antitrust injury." Essentially, defendants argue that Baum's alleged injury is from competition rather than a lack of competition, and thus Baum's injury does not arise from a violation of the antitrust laws.

As will be explained below, Baum has failed to state an antitrust claim on which relief can be granted because it can prove no set of facts to show that it suffered an antitrust injury. Accordingly, defendants' motions to dismiss the antitrust counts of the compliant will be granted. Baum will have leave to amend the state-law claims to better describe them.

### II.  The Complaint

The following is a summary of the allegations in Baum's meandering forty-four page complaint. The complaint is in six counts:

Count I—Conspiracy to Monopolize—Section 2 of the Sherman Antitrust Act—All Defendants

Count II—Conspiracy to Restrain Trade—All Defendants

Count III—Conspiracy in Restraint of Trade—Section 2 of the Michigan Antitrust Reform Act of 1984—All Defendants

Count IV—Conspiracy to Monopolize—Section 2 of the Michigan Antitrust Reform Act of 1984—All Defendants

Count V—Interference with Contractual Relationships—Defendants H & B, Easton, and Worth

Count VI—Interference with Prospective Economic Advantage and Business Relationships—H & B, Easton, Worth and SGMA

Thus there are two categories of claims: antitrust and tort.

The federal antitrust claims are brought pursuant to sections 4 and 16 of the Clayton Act.[1] Section 4 of the Clayton Act, 15 U.S.C. § 15, provides in part: "[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States...." Under section 16 of the Clayton Act: "Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws...."

### A. Antitrust claims

#### 1. Relevant Market and Parties

The relevant market is the market for baseball bats used in amateur baseball, which includes, but is not limited to, collegiate baseball.[2] Baum is a manufacturer of wooden composition baseball bats. Defendant bat manufacturers manufacture aluminum bats. Baum implicitly acknowledges that the aluminum bats manufactured by defendants are superior in performance to wooden bats. Baum also notes that the wooden bats cost less than the aluminum bats. The aluminum bats produced by defendant bat manufacturers are used by ninety percent of the market. Defendant bat manufacturers have signed exclusive contracts with various college teams to provide baseball bats, though Baum does not allege how many teams have signed exclusive contracts or the length of such contracts.

The NCAA is an association of colleges and universities that participate in intercollegiate athletics. The NCAA adopts and promulgates playing rules, among other things. According to the complaint, the SGMA is "a not-for-profit trade association of manufacturers."

#### 2. NCAA Rules

NCAA rules allow wooden and aluminum bats to be used in NCAA-sanctioned baseball games. NCAA rules did not restrict the performance of bats during the relevant time period. According to Baum, three consequences flow from the purportedly lax standards. First, college baseball has become unsafe due to the speed at which a baseball travels after being hit with an aluminum bat. Second, aluminum bats have compromised the integrity of the game due to a recent, dramatic rise in runs scored in collegiate baseball games. Third, defendant bat manufacturers have aggressively competed with each other to design and manufacture high performance aluminum bats.

#### 3. The Conspiracy

On their face, the NCAA rules regarding baseball bats seem benign; they contain few restraints on bat manufacturers. Baum,

---

1. The state antitrust claims are analyzed under the same precedent as the federal claims. Pursuant to Mich.Comp.Laws Ann. § 445.784(2):

   It is the intent of the legislature that in construing all sections of this act, the courts shall give due deference to interpretations given by the federal courts to comparable antitrust statutes, including, without limitation, the doctrine of per se violations and the rule of reason.

2. According to Baum: "In amateur baseball, the Division I teams of the NCAA are recognized in the sport as a flagship standard setter, so that the use of a baseball bat with high performance hitting capabilities at the NCAA Division I level will permeate amateur baseball and cause NCAA Division II and III teams, high school teams, and little league baseball teams to follow suit and employ similar baseball bats. Thus, control of bat selection at the NCAA Division I level controls bat selection through all of amateur baseball and the market for amateur baseball bats."

however, says the rules, or lack thereof, are the product of a conspiracy by defendants to squeeze Baum's wooden bat out of the market. Particularly, according to Baum, the bat manufacturers conspired to eliminate competition in the market by: "engaging in exclusive arrangements with universities and colleges which foreclose those institutions from using competing products;" "entering into exclusive agreements with coaches which foreclose the use of competing products by the teams they coach;" and "operating through and with the active participation of SGMA and the NCAA to manipulate and control the standard-setting function of the Rules Committee of the NCAA to establish unreasonable bat performance standards that exclude wood or wood composition bats from competition." Baum says the effect of the conspiracy "has been to systematically exclude the manufacturers of wood or wood composition bats, such as [Baum], from the markets for amateur baseball bats."

#### 4. Theory of Case

A concise statement of Baum's theory of the case is as follows:

- Baum is injured because it is unable to sell its wooden composition bats to college baseball teams.

- The injury is caused by the lax NCAA standards that allow aluminum bats.

- The lax NCAA standards stem from a conspiracy between defendant bat manufacturers, the SGMA, and the NCAA to entrench defendant bat manufacturers in, and exclude Baum from, the relevant market.

- The conspiracy is a violation of the antitrust laws;[3] specifically, defendants have conspired to restrain trade in violation of 15 U.S.C. § 1 and the corresponding

state law provision,[4] and have conspired to monopolize in violation of 15 U.S.C § 2 and the corresponding state law provision.[5]

#### B. Tort claims

Baum says it entered into agreements to sell wooden composition bats to members of the Mid–American Conference, and that defendant bat manufacturers unreasonably interfered with the contracts to induce "the Mid–American Conference to reject the Baum Bat and the contracts [Baum] made with the teams in that conference." Baum also claims that defendant bat manufacturers and the SGMA engaged in a concerted campaign to: "Remove and destroy Baum's bats;" "Sideline the Baum Hitting Machine;" "Prevent Baum from establishing relationships with amateur baseball teams;" and "Disrupt Baum's sales to minor league professional baseball teams." As a result, Baum claims defendant bat manufacturers interfered with its prospective economic advantage.

### III. Analysis

#### A. Standard of Review

When analyzing a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the Court must take the well-pleaded allegations as true. *Miree v. DeKalb County,* 433 U.S. 25, 27 n. 1, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977). "[W]hen an allegation is capable of more than one inference, it must be construed in the plaintiff's favor." *Sinay v. Lamson & Sessions Co.,* 948 F.2d 1037, 1039–40 (6th Cir.1991). "[A] complaint should be dismissed for failure to state a claim only where 'it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"

---

**3.** Baum briefly mentions that defendants "engaged in fixing of prices for aluminum and aluminum alloy bats by artificially inflating prices at the retail level to secure monopoly profits and to fund the protection of their monopoly."

**4.** Under 15 U.S.C. § 1:
Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. Every person who shall

make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony....

**5.** Under 15 U.S.C. § 2:
Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony....

*Monette v. Electronic Data Systems*, 90 F.3d 1173, 1189 (6th Cir.1996) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The essential elements of a private antitrust claim must be alleged in more than vague and conclusory terms to prevent dismissal of the complaint on a defendant's 12(b)(6) motion." *Crane & Shovel Sales Corp. v. Bucyrus–Erie Co.*, 854 F.2d 802, 805 (6th Cir.1988).

### B. Antitrust Injury

As a threshold matter, Baum, a private antitrust plaintiff bringing suit pursuant to sections 4 and 16 of the Clayton Act, is required to plead facts tending to show "antitrust injury," a concept akin to standing.[6] "A private antitrust plaintiff does not acquire standing merely by showing that he was injured in a proximate and reasonably measurable way by conduct of the defendant violating the antitrust laws." III Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 362a at 209–10 (1995). Rather, as first explained in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977):

> Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. *The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.* It should, in short, be "the type of loss that the claimed violations ... would be likely to cause."

(Second emphasis added) (citation omitted). *See also Cargill, Inc. v. Monfort of Colorado,*

*Inc.*, 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986) (antitrust injury required to obtain injunctive relief under § 16 of the Clayton Act). "The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990). As elucidated by the United States Supreme Court:

> The Sherman Act reflects a legislative judgment that ultimately competition will produce not only lower prices, but also better goods and services. "The heart of our national economic policy long has been faith in the value of competition." *Standard Oil Co. v. FTC*, 340 U.S. 231, 248, 71 S.Ct. 240, 95 L.Ed. 239 [ (1951) ]. The assumption that competition is the best method of allocating resources in a free market recognizes that all elements of a bargain—quality, service, safety, and durability—and not just the immediate cost, are favorably affected by the free opportunity to select among alternative offers. Even assuming occasional exceptions to the presumed consequences of competition, the statutory policy precludes inquiry into the question whether competition is good or bad.

*National Society of Professional Engineers v. United States*, 435 U.S. 679, 695, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). The mere fact that a competitor has lost profits does not necessarily indicate that competition in the market is lessened. *See Tennessean Truckstop, Inc. v. NTS, Inc.*, 875 F.2d 86, 88 (6th Cir.1989).[7]

---

**6.** The related concepts of antitrust injury and antitrust standing are often confused.

This confusion occurs because the two concepts "share a common ingredient." The common ingredient is that both requirements limit "recovery to those who have been *injured by* restraint on competitive forces in the economy." Any inquiry to determine whether antitrust injury has been shown is more limited than one to determine whether the plaintiff has standing. The single determinant of antitrust injury is whether the plaintiff has suffered an "injury the type the antitrust laws were intended to prevent and that flows from that which makes [a defendant's] act[ ] unlawful." On the

other hand, even if an antitrust injury is shown sufficiently, standing may be denied on the basis of other factors. The purpose of the additional inquiries is to confine recovery to cases that promote the congressional intent to ensure that consumers receive the benefits of competitive markets.
*Axis S.p.A. v. Micafil, Inc.*, 870 F.2d 1105, 1110–11 (6th Cir.1989) (citations omitted).

**7.** "[I]t is important for courts to keep in mind that the main purpose of the antitrust laws is to preserve and promote competition. Whether or not a particular practice violates the antitrust laws is determined by its effect on competition, not its effect on a competitor." *Richter Concrete*

■ The Court of Appeals for the Sixth Circuit has fashioned a two-pronged test from *Brunswick* and its progeny:

> [T]he antitrust plaintiff "must show (1) that the alleged violation tends to reduce competition in some market and (2) that the plaintiff's injury would result from a decrease in that competition rather than from some other consequence of the defendant's actions."

*Tennessean Truckstop*, 875 F.2d at 88 (quoting Areeda & Hovenkamp, *Antitrust Law* ¶ 334.1b at 299 (1988 Supp.)). Baum can prove no set of facts to satisfy either prong.

### 1. Anticompetitive Effect

■ Baum has not averred that competition in the amateur baseball bat market is at all reduced by virtue of the alleged conspiracy to manipulate the rules for baseball bats. Instead, Baum focuses exclusively on the fact that it cannot sell its bat in the relevant market without a rule regulating the performance of its competitors' bats. Indeed, Baum acknowledges that H & B, Easton, and Worth have "aggressively compet[ed] with each other." [8] Thus the fatal flaw in Baum's case: the NCAA rules, even if the result of a conspiracy that violates the antitrust laws, pose no threat to competition in the relevant market. In fact, there is a logical inference that the absence of a rule regulating bat performance actually fosters competition. [9]

A brief examination of *Brunswick* and its progeny illustrates why Baum's theory is flawed. In *Brunswick*, the defendant, at the time the largest operator of bowling centers, acquired several bowling centers with financial problems in the markets in which the plaintiff bowling centers operated. The plaintiffs sued the defendant for damages pursuant to section 4 of the Clayton Act, claiming that by acquiring the financially troubled bowling centers, the defendant

"might substantially lessen competition or tend to create a monopoly" in violation of the antitrust laws. *Brunswick*, 429 U.S. at 480, 97 S.Ct. 690. Although the Supreme Court assumed that the plaintiffs would have lost profits as a result of the defendant's illegal acquisition of the bowling centers, it found that the plaintiffs did not suffer an antitrust injury:

> At base, respondents complain that by acquiring the failing centers petitioner preserved competition, thereby depriving respondents of the benefits of increased concentration. *The damages respondents obtained [in the district court] are designed to provide them with the profits they would have realized had competition been reduced. The antitrust laws, however, were enacted for "the protection of competition not competitors[.]" It is inimical to the purposes of these laws to award damages for the type of injury claimed here.*

*Id.* 429 U.S. at 488, 97 S.Ct. 690 (emphasis added) (citation omitted). As Areeda and Hovenkamp have explained in their treatise: "At its most fundamental level, the antitrust injury requirement precludes any recovery for losses resulting from competition, even though such competition was actually caused by conduct violating the antitrust laws." Areeda & Hovenkamp, *Antitrust Law*, ¶ 362a at 210.

The Court of Appeals for the District of Columbia Circuit's decision in *Dial A Car, Inc. v. Transportation, Inc.*, 82 F.3d 484 (D.C.Cir.1996), is also instructive. There, the plaintiff and the defendants competed in the "Blue Car," or corporate account, taxicab market. Unmarked luxury cars, which are expensive to operate, are generally used in the "Blue Car" market. The plaintiff claimed that the defendants, two competitors, attempted to monopolize the "Blue Car" market by offering "Blue Car" service with regu-

---

*Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 825 (6th Cir.1982).

**8.** Baum has not alleged that defendant bat manufacturers have conspired to divide the market.

**9.** Baum's concern about the safety of the aluminum bats does not alter the analysis of whether

an antitrust injury exists. In *National Society of Professional Engineers*, 435 U.S. at 695, 98 S.Ct. 1355, the Supreme Court stated that an attempt to justify a restraint on competition "on the basis of the potential threat that competition poses to the public safety and the ethics of its profession is nothing less than a frontal assault on the basic policy of the Sherman Act."

lar taxicabs, which are less expensive to operate. Thus, the plaintiff argued that the defendants' ability to offer lower prices was a form of predatory conduct intended to drive the plaintiff out of the market, thereby monopolizing the "Blue Car" market in violation of section 2 of the Sherman Act. Defendants moved to dismiss the complaint arguing, among other things, that the plaintiff had not shown an antitrust injury.

After noting that, because the antitrust laws "were enacted for the protection of competition, not competitors, [the plaintiff] must allege facts that would show an anticompetitive impact on the market as a whole," *id.* 82 F.3d at 486 (citations omitted), the court stated:

> The District Court found that [the plaintiff] had pleaded no facts that would show that appellees' conduct was anticompetitive. Indeed, the introduction of both [defendants] into the market (whether legal or not) would appear to be fostering competition, rather than reducing it. While [the plaintiff] alleges injury to itself, that injury involves only one specific competitor and is insufficient to support a finding that the market as a whole is or will be injured.

*Id.* 82 F.3d at 486–87. Accordingly, the court held that the plaintiff's complaint was properly dismissed.

Baum has only alleged an injury to a single competitor: itself. Baum has not alleged an injury to the amateur baseball bat market as a whole. In fact, it has alleged the opposite: that lax standards have allowed its competitors to compete "aggressively" with each other by designing and manufacturing superior products. Baum's alleged injury—its inability to sell the Baum Bat—is not the result of any anticompetitive effect on the market. Rather, Baum's injury stems from the competition itself: the performance of Baum's wooden composition bat is inferior to that of the bats manufactured by H & B, Easton, and Worth. "Competition is a ruthless process ... and the antitrust laws are not balm for the rivals' wounds." *Tennessean Truckstop, Inc. v. NTS, Inc.,* 875 F.2d 86, 90 (6th Cir.1989) (quoting *Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.,* 784 F.2d 1325, 1338 (7th Cir.1986)). Indeed,

[a]nticompetitive conduct is conduct designed to destroy competition, not just to eliminate a competitor. Lively legal competition will result in the efficient and shrewd businessman routing the inefficient and imprudent from the field. The antitrust laws must be administered in such a way that they do not restrain such vigorous competition in order to protect inefficient competitors. As Judge Learned Hand has pointed out, "The successful competitor, having been urged to compete, must not be turned upon when he wins." *United States v. Aluminum Company of America,* 148 F.2d 416, 430 (2d Cir.1945). Merely to attempt to succeed in business is not anticompetitive conduct.

*Richter Concrete Corp. v. Hilltop Concrete Corp.,* 691 F.2d 818, 823 (6th Cir.1982).

### 2. Necessary Predicate

■ Even if Baum could somehow establish that the NCAA's failure to regulate bat performance had an anticompetitive effect on the market, Baum cannot show that its injury flowed from the purported violation of the antitrust laws. Simply put, assuming the conspiracy to manipulate the NCAA rules for baseball bats violated the antitrust laws, Baum cannot establish that the violation was the "necessary predicate" to its injury because it lawfully could have been excluded from the market by the NCAA. *See Valley Products Co., Inc. v. Landmark,* 128 F.3d 398, 404 (6th Cir.1997).

For example, in *Axis, S.p.A. v. Micafil, Inc.,* 870 F.2d 1105 (6th Cir.1989), the defendant purchased two companies that held the rights to use key patents. The plaintiff, an Italian manufacturer of armature winding machines, claimed it was foreclosed from entering the relevant American market for the product due to the defendant's illegal acquisition of the competitors. Although it assumed the defendant's acquisition of the competitors violated the antitrust laws, the Sixth Circuit held that the plaintiff had not stated a claim on which relief could be granted:

> The injury for which [the plaintiff] sought relief was not inflicted by reason of [the defendant's] newly-acquired position in the market and the elimination of one competi-

tor. The patents and licenses owned and possessed by three companies[,] ... not by [the defendant] alone, precluded [the plaintiff's] entry into the U.S. market for armature winding machines. Thus, Axis' alleged injury is not "of the type the antitrust laws were intended to prevent" and it did not "flow from" the element of the acquisition that made it unlawful.

*Axis,* 870 F.2d at 1112 (quoting *Brunswick,* 429 U.S. at 489, 97 S.Ct. 690).

Also, in *Hodges v. WSM, Inc.,* 26 F.3d 36 (6th Cir.1994), the plaintiffs alleged that the defendants, operators of "Opryland" and owners of an airport shuttle service, conspired to divide the market for airport shuttle service by entering into agreements with other shuttle service companies. The allegation essentially was that the other shuttle service companies agreed not to transport passengers from the airport to Opryland, and Opryland in turn would hire vans and buses from the shuttle service companies, including the plaintiffs, for its sightseeing tour business. The plaintiffs asserted that this conspiracy deprived them of the opportunity to compete in the airport shuttle service market.

The Sixth Circuit affirmed the district court's dismissal pursuant to Fed.R.Civ.P. 12(b)(6), opining that:

> The district court applied correctly the *Axis* reasoning to dismiss the complaint. Here, defendants were accused of orchestrating with former competitors a combination designed to free defendants of competition. This violation of the antitrust laws, a market division conspiracy to restrain competition, was not the cause of plaintiffs' exclusion from the shuttle service market between the airport and Opryland. In *Axis,* the plaintiff was injured by the lawful refusal of the defendant and others to share their patents; here, plaintiffs' injury resulted from defendants' lawful refusal to

grant plaintiffs access to their private property. Accordingly, plaintiffs were not harmed by the kind of evil contemplated by § 1 of the Sherman Act. Their injury was not an "antitrust injury" because it did not result from any decrease in competition among shuttle operators.

*Id.* 26 F.3d at 39. *See also Valley Products,* 128 F.3d at 404 ("the sales losses would have been suffered as a result of the cancellation whether or not [the defendant] had entered into the alleged tying arrangements with the franchisees. Here, as in *Hodges,* the alleged antitrust violation was simply not a necessary predicate to the plaintiff's injury.").

As the NCAA points out, Baum's injury stems from the NCAA's lawful authority to regulate the rules for baseball bats.[10] Or, more appropriately, Baum's injury flows from the NCAA's lawful refusal to change the baseball bat rules in its favor. As in *Axis* and *Hodges,* Baum's injury flows from the NCAA's lawful refusal to grant it a privilege rather than violations of the antitrust laws. The violation of the antitrust laws, therefore, is not the necessary predicate to Baum's injury; Baum cannot show that "defendants could exclude plaintiff[ ] only by engaging in the antitrust violation." *Hodges,* 26 F.3d at 39.[11]

### C. Tort Claims

#### 1. Interference with Contractual Relations

Baum claims that defendant bat manufacturers unreasonably interfered with its contracts to induce "the Mid–American Conference to reject the Baum Bat and the contracts [Baum] made with the teams in that conference." The elements of a claim for tortious interference with contractual relations are: "(1) a contract, (2) a breach, and (3) instigation of the breach without justification by the defendant." *See Wood v. Herndon & Herndon,* 186 Mich.App. 495, 499, 465 N.W.2d 5 (1990).[12]

---

**10.** In analyzing whether the alleged violation of the antitrust laws was the "necessary predicate" to Baum's injury, the Court assumes that defendants violated the antitrust laws.

**11.** In addition, the NCAA argues that the antitrust claims should be dismissed on the ground that it is not subject to Sherman Act scrutiny under the circumstances because formulation of

bat performance standards is a "fundamentally noncommercial activity." This argument, however, need not be addressed given that Baum lacks standing to bring the antitrust claims.

**12.** Although Baum argues that defendant bat manufacturers have misrepresented the elements of the claim, the elements Baum argues are applicable also contain an element of breach.

Defendant bat manufacturers move to dismiss this count, arguing that "the complaint simply does not indicate whether any contracts were breached as a result of any actions by Defendants." In response, Baum says the allegation is that defendant bat manufacturers' conduct "caused teams within the Mid–American Conference to *breach contracts* with the plaintiffs." Baum shall have the opportunity to clarify this ambiguity in an amended complaint. If Baum does not file an amended complaint, this count will be dismissed.

### 2. Interference With Prospective Economic Advantage

 Baum also claims that defendant bat manufacturers and the SGMA engaged in a concerted campaign to: "Remove and destroy Baum's bats;" "Sideline the Baum Hitting Machine;" "Prevent Baum from establishing relationships with amateur baseball teams;" and "Disrupt Baum's sales to minor league professional baseball teams." As a result, Baum claims defendant bat manufacturers and the SGMA interfered with its prospective economic advantage.

Defendant bat manufacturers and the SGMA move to dismiss this claim, arguing that Baum "must show an interference with a *realistic expectation* of an economic relationship, an expectation which amounts to more than that of wishful thinking." Defendant bat manufacturers argue that Baum has not described its hope for business, and Baum did not have a specific expectancy because defendant bat manufacturers sell over ninety percent of the bats in the market. The allegations supporting this count are sparse. Baum shall have an opportunity to amend the complaint to better describe its expectations. If it does not, this count will be dismissed.

### IV. Conclusion

Although the Supreme Court has admonished that "in antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly," *see Hospital Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976) (citation omitted), courts have not been hesitant to dismiss cases for failure to state a claim when the plaintiff cannot show an antitrust injury. *See Valley Products*, 128 F.3d at 403 ("The Sixth Circuit, it is fair to say, has been reasonably aggressive in using the antitrust injury doctrine to bar recovery where the asserted injury, although linked to an alleged violation of the antitrust laws, flows directly from conduct that is not itself an antitrust violation."); *Dial A Car*, 82 F.3d at 484. If the determination that antitrust injury is absent "can be made with confidence on the basis of the complaint, it is better to cut the string before the substantial costs of litigating an antitrust case have been incurred." *Tennessean Truckstop*, 875 F.2d at 91.