*555 SUTTON, Circuit Judge,
dissenting.
Ordinarily, I would agree with the majority that the Rule 12(b)(6)-stage of this matter counsels in favor of permitting the litigation to proceed beyond the pleading stage. But antitrust standing is a pleading-stage inquiry and when a complaint by its terms fails to state a cognizable claim of antitrust injury we must dismiss it as a matter of law — lest the antitrust laws become a treble-damages sword rather than remain the shield against competition-destroying conduct that Congress meant them to be. “Antitrust standing,” it bears repeating, “is not a mere technicality. It is the glue that cements each suit with the purposes of the antitrust laws, and prevents abuses of those laws.” HyPoint Tech., Inc. v. Hewlett-Packard Co., 949 F.2d 874, 877 (6th Cir.1991).
That is why this court frequently has required the dismissal of antitrust actions at the pleading stage due to lack of standing — due in other words to the claimant’s failure to show that it suffered a cognizable antitrust injury. See Indeck Energy Servs. v. Consumers Energy Co., 250 F.3d 972, 976 (6th Cir.2000); Valley Prods. Co. v. Landmark, 128 F.3d 398, 406 (6th Cir.1997); Peck v. Gen. Motors Corp., 894 F.2d 844, 846 (6th Cir.1990); Dry v. Methodist Med. Ctr., Inc., 893 F.2d 1334 (6th Cir.1990); Apperson v. Fleet Carrier Corp., 879 F.2d 1344, 1352 (6th Cir.1989); Tennessean Truckstop, Inc. v. NTS, Inc., 875 F.2d 86, 90 (6th Cir.1989); Axis, S.p.A. v. Micafil, Inc., 870 F.2d 1105, 1111 (6th Cir.1989); Southaven Land Co. v. Malone & Hyde, Inc., 715 F.2d 1079, 1088 (6th Cir.1983); see also N.W.S. Mich., Inc. v. Gen. Wine & Liquor Co., 58 Fed.Appx. 127, 129 (6th Cir.2003); Park Ave. Radiology Assocs., P.C. v. Methodist Health Sys., No. 98-5668, 1999 WL 1045098, *3, 1999 U.S.App. LEXIS 29986, at *8-9 (6th Cir. Nov. 10, 1999). In this instance, because “the injury and damages” suffered by Nic-Sand do not “match the rationale for finding [an antitrust] violation,” HyPoint Tech., 949 F.2d at 879— but indeed flow from the kind of competition that the antitrust laws were designed to foster — it has not established a cognizable injury.
As this case comes to the court, it presents a most unusual candidate for antitrust protection. The case, to begin with, involves a claim by one competitor against another and thus implicates the classic rejoinder that the antitrust laws protect competition, not competitors. See Brown Shoe Co. v. United States, 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962) (noting that the antitrust laws are “concerned] with the protection of competition, not competitors ”).
When courts nonetheless have permitted one competitor to deploy the antitrust laws against another, that typically has been because one of them — usually, the larger competitor — has engaged in some form of predatory pricing or illegal tying. See, e.g., Utah Pie Co. v. Continental Baking Co., 386 U.S. 685, 697-98, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967) (predatory pricing); Int’l Bus. Machs. Corp. v. United States, 298 U.S. 131, 137-40, 56 S.Ct. 701, 80 L.Ed. 1085 (1936) (illegal tying); Spirit Airlines, Inc. v. Nw. Airlines, Inc., 431 F.3d 917, 921 (6th Cir.2005) (predatory pricing); LePage’s, Inc. v. 3M, 324 F.3d 141, 155 (3rd Cir.2003) (illegal tying); Bell v. Cherokee Aviation Corp., 660 F.2d 1123, 1125 (6th Cir.1981) (illegal tying). But here NicSand (the smaller competitor) concedes that 3M has not engaged in any form of predatory pricing and makes no allegations about any form of illegal tying.
Stranger still, NicSand’s “monopolization” claim seeks treble damages for its loss of a corner on this market and its loss of 40-50% profit margins on sales of automotive sandpaper. According to the alie- *556 gations in NicSand’s amended complaint, the retail market for do-it-yourself automotive sandpaper in 1997 consisted primarily of six large retailers- — -Advanced Auto, Autozone, CSK, KMart, Pep Boys and Wal-Mart — which made up 80% of the retail market for the sandpaper. And the wholesalers to this large-retailer market consisted of just two players — NicSand and 3M. In 1997 (and for several years before that), Wal-Mart sold 3M sandpaper, Pep Boys sold NicSand and 3M sandpaper, and the four other large retailers sold NicSand sandpaper. Before 3M’s alleged misconduct, NicSand acknowledges that it controlled 67% of the entire market and sold its sandpaper at approximately 40-50% over cost.
Between 1997 and 2000, 3M entered into contracts to supply automotive sandpaper to Advanced Auto, Autozone, CSK and KMart and did so at prices ranging from 10% to 30% over NicSand’s costs. But nothing about this sequence of events suggests an antitrust violation. As to the market share that 3M garnered over these years, “it takes one to know one” is hardly an accredited hallmark of antitrust liability — particularly when NicSand’s apparent solution to this problem is not to encourage the entry of other suppliers to this lopsided market but to preserve its 67% market share. As to 3M’s discounting, NicSand of course has no right — under the antitrust laws no less — to preserve 40-50% margins on a product that (so far as the allegations are concerned) does not take any ingenuity to make. One can fairly doubt the size of NicSand’s and 3M’s R & D departments for automotive sandpaper.
Unable to argue that 3M’s discounting amounted to anything but legitimate (and apparently long-overdue) competition, Nic-Sand focuses on the fact that 3M entered into exclusive contracts with the four large retailers that switched from NicSand to 3M. Yet according to NicSand’s amended complaint, the retailers made exclusivity one of the preconditions for doing business with a new supplier. The complaint says that the large retailers (1) choose to carry just one brand of automotive sandpaper for sale to consumers, (2) re-negotiate these one-brand contracts just once a year, (3) require a new supplier to purchase the retailer’s existing supply of automotive sandpaper, (4) require a new supplier to provide racks and other display equipment, (5) require a new supplier to produce a full line of automotive sandpaper and (6) require a new supplier to provide a discount on the retailer’s first order. Nic-Sand of course complied with these requirements in obtaining the supply business it held in 1997, and 3M complied with them in winning some of that business away. If retailers have made supplier exclusivity a barrier to entry, one cannot bring an antitrust claim against another supplier for complying with that precondition. Put another way, NicSand did not sue 3M insisting that it had a right to share shelf space; it sued 3M because it wanted that shelf space all to itself — just as it had it in 1997. This is precisely the kind of all-for-one-and-all-for-one competitor claim that the antitrust laws do not protect.
There being no right under the antitrust laws for NicSand to preserve a 67% market share, there being no right to preserve its 40-50% margins, there being no impermissible discounting or other predatory pricing by 3M and there being no right to prohibit 3M from entering into exclusive contracts, NicSand picks up the only arrow left — the length of 3M’s exclusive contracts. What NicSand decries, then, is not so much that 3M entered into exclusive contracts with these four retailers but that it did so for more than one year.
*557 As an initial matter, several ambiguities cloud this last remnant of a tenable complaint: How long are these exclusive contracts? And who demanded them- — -the retailers or 3M? All that the complaint says is that they will last “several years.” It never says whether that amounts to two to three years or three to five, whether each of the four contracts has the same term and what the termination provisions are under each contract. Even then, the only factual allegation supporting the “several years” premise is that NicSand approached one of the large retailers (KMart), and it said that “it would be a few years before NicSand would again be allowed to quote” the retailer on sandpaper. JA 59. NicSand complains that it cannot resolve this ambiguity without discovery, but it never explains how it determined the prices the retailers paid 3M in these deals or why the large retailers (as opposed to 3M) would not disclose the terms of these deals in hopes of encouraging NicSand to offer still better terms.
Given everything else in the complaint showing that the large retailers held the bargaining power in this market, it makes perfect sense to assume that the retailers either insisted on the “several years” terms or that they at least welcomed them. And why not: having paid NicSand prices generating 40-50% margins for NicSand, one can well imagine why the retailers would be eager to lock in far better prices with 3M for several years rather than just one. Of course, if the retailers demanded or welcomed this term, any claim would have to be brought against them, not 3M. But even if we give NicSand considerable leeway in reading its complaint — by assuming that 3M insisted on including this term in the contracts and by assuming that “several years” last three to five years— that still does not establish a cognizable antitrust injury.
As a competitor, NicSand undoubtedly was injured by these contracts. It had business that was lost, and it would not be able to win that business back for three to five years. But to survive a motion to dismiss, NicSand not only had “to show injury-in-fact and proximate cause,” but also had “to allege ... antitrust injury.” Louisiana Wholesale Drug Co. v. Hoechst Marion Roussel, Inc. (In re Cardizem CD Antitrust Litig.), 332 F.3d 896, 909-10 (6th Cir.2003). An “injury, although causally related to an antitrust violation, nevertheless will not qualify as ‘antitrust injury’ unless it is attributable to an anticompeti-tive aspect of the practice under scrutiny, since it is inimical to the antitrust laws to award damages for losses stemming from continued competition.” Atl. Richfield Co. v. United States Petroleum Co., 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) (internal quotation marks and brackets omitted).
While exclusive contracts in some instances may create impermissible barriers for new entrants to a market and may permit a supplier to charge monopoly prices, NicSand has not claimed — and cannot tenably claim- — -that it suffered these anticompetitive effects. NicSand’s economic injuries plainly did not result from antitrust injuries in the nature of high entry barriers to the market. Before 1997, after all, NicSand controlled 67% of the market, and used the existing barriers to entry— annual contracts and exclusive shelf space — to preserve its lock on the market. From 1997 to 2000, when 3M competed for and won the contracts with the four large retailers formerly supplied by NicSand, the barriers to entry caused by exclusive dealing still existed, and were gradually enhanced as the contracts went from a de facto annual term to a “several years” term. Through all of this, however, the critical point is that NicSand was not a potential entrant; it was the market lead *558 er. Yet NicSand offers no explanation why it could not have competed for “several years” term contracts or why (in view of its high margins) it could not have won those contracts by matching 3M’s discounts. As the market leader, NicSand was on the inside looking out, and for whatever reason the company chose not to compete with 3M for these contracts.
This alleged barrier to entry thus did not exist when 3M came to KMart (then NicSand’s customer) with its “several years” offer in 1997. Nor did it exist when 3M came to CSK and Advance Auto in 1998. And in 2000, when NicSand had only one of the big box retailers remaining, it still controlled over 40% of the market due to the sheer size of its business with Autozone. Yet still 3M successfully competed for the contract. While NicSand eventually declared bankruptcy in 2001, it offers no explanation (and makes no allegations) regarding any efforts before then to recoup the business from KMart (which entered the 3M contract in 1997) or from CSK or Advance Auto (which entered the contracts in 1998). Nor does 3M’s size make a difference to the disposition of these allegations. See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 487-88, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (“Yet respondents’ injury ... bears no relationship to the size of ... its competitor!;]. Respondents would have suffered the identical loss — but no compensable injury — had the acquired centers instead ... been purchased by shallow pocket parents .... Thus, respondents’ injury was not of the type that the statute was intended to forestall.”) (internal quotation marks omitted). In the end, NicSand simply has not alleged facts establishing that the “several years” term of the 3M contracts created market-entry barriers that caused it a cognizable antitrust injury.
NicSand’s injury also does not stem from 3M’s alleged monopolization of the market. For most of the time NicSand was losing business, it still controlled a majority or at least a plurality of the market. NicSand never alleges that it suffered from monopoly prices imposed by 3M or from any other underhanded monopolist tactic. While NicSand appears to complain about the discounts that 3M offered, it does not allege that 3M was selling below cost, and the numbers that Nic-Sand itself offers demonstrate that the prices 3M offered were comfortably over NicSand’s costs. While NicSand’s losses may have propelled 3M into a dominant market position, its injury does not correspond to any allegedly anticompetitive effect on the market, but rather a truly competitive one. Even if 3M were to begin charging higher prices (presumably at the end of the “several years” contract), it is hard to believe that these prices would exceed the 40-50% profit margins that NicSand enjoyed during its market dominance.
Any doubt about the appropriate resolution of this case, it seems to me, can be laid to rest by Indeck Energy Services v. Consumers Energy Co., 250 F.3d 972 (6th Cir.2000). There an energy supplier (In-deck) alleged that a competitor (Consumers Energy) violated the antitrust laws by signing an exclusive supply contract with General Motors for a period of five to ten years. Id. at 975. The contract came on the heels of similar contracts with “17 other large industrial/commercial customers,” through all of which Consumers Energy “succeeded in excluding competition from over 80 percent of the Relevant At Risk Market.” Id. Central to the resolution of that case, as to this one, was that “the only harm allegedly suffered by In-deck was in the company’s capacity as a competitor in the marketplace, not as a defender of marketplace competition.” Id. *559 at 977. There has been “no indication,” the court emphasized, “that competition itself was harmed by any act of the defendants. Consequently, the antitrust damages alleged by Indeck are too indirect and speculative to justify assertion of federal antitrust jurisdiction over this matter.” Id. Even if Indeck “were able to establish the preemption from the relevant market that it asserts,” the court added, “it has failed to allege how such acts have injured competition, especially in light of the discounted rates offered to the customers, in light of the fact that the exclusive contracts were of limited duration, and in light of the fact that the customers were free to seek other [providers] at the conclusion of the contracts.” Id. at 977-78.
Indeck, it would seem, was the harder case. Consumers Energy controlled a larger percentage of the market (80%) than 3M does. (Recall that 3M did not control all of the large-retail market because it shared shelf-space with NicSand at Pep Boys stores, and NicSand has not alleged that 3M supplies any of the 20% of the market not controlled by the large retailers.) Consumers Energy entered into longer exclusive contracts (5-10 years) than 3M (“several years”). And Consumers Energy did not unseat the dominant market leader (like 3M did) but hindered a potential market entrant. Indeck was hardly a dominant supplier of energy, as it provided cogeneration services (recycling factory waste to create energy), which diminish a customer’s need for traditional energy rather than supply such energy. Indeck, in short, was more akin (far more akin) to a market entrant than NicSand.
The majority maintains that Indeck can be distinguished on the ground that today’s case involves a series of contracts with several retailers as opposed to several contracts with one retailer. As a result, the majority submits, while Indeck’s harm resulted only from competition, NicSand “suffered not simply as a single competitor in the market, but as a proxy for all competitors, and thus for all competition.” Maj. Op. at 554. But this seems to invert the relative vices and virtues of the two fact patterns. While NicSand originally held all of the contracts with the retailers in question and lost them to competition, Indeck lost out on a single contract and alleged that it found itself in a market where a single dominant firm controlled 80% of the market with exclusive contracts of 5 to 10 years with all of the major industrial and commercial customers. If the harm to the market is the entry barriers established by “exclusive contracts,” it is Indeck, not NicSand, that makes the better proxy for injury to competition in the market rather than harm to a competitor. NicSand had the opportunity to compete for each of the contracts whereas Indeck never had that opportunity because of the existing exclusive contracts. Nonetheless, we concluded in Indeck that there was no harm to competition because In-deck “failed to allege how [the exclusive contracts] have injured competition, especially in light of the discounted rates offered to the customers, in light of the fact that the exclusive contracts were of limited duration, and in light of the fact that the customers were free to seek other [providers] at the conclusion of the contracts.” 250 F.3d at 977-78. We rested our decision on these grounds, and these grounds control us here — with NicSand, if anything, having the less compelling complaint. When one exclusive dealer is replaced by another exclusive dealer, the victim of the competition does not state an antitrust injury. See Herbert Hovencamp, Antitrust Law: an Analysis of Antitrust Principles and Their Application, 11 Antitrust Law ¶ 1823(b) (2005) (“Clearly not a victim of antitrust injury is the exclusive dealing partner whose business relation *560 ship was terminated in favor of a different exclusive dealing partner.”).
The majority next maintains that Indeck can be distinguished on the ground that 3M’s exclusive dealing arrangements have eliminated a superior product, noting that NicSand allegedly provides a better variety of products and better service than 3M. Indeck, it is true, noted that antitrust actions by marketplace competitors “must at least allege that exclusion of the competitor from the marketplace results in the elimination of a superior product or a lower-cost alternative” because these developments might show “that competition itself was harmed by an[] act of the defendants.” 250 F.3d at 977. But the court still rejected Indeck’s claim even though the company had alleged that its competitor’s conduct caused the market to become less diversified because Indeck provided “alternative sources of electrical power,” namely thermal power, whereas its competitor supplied only traditional electrical power. Id. at 975. As Indeck suggests, then, diversity of products by itself will not sustain a claim. NicSand by its own admission was not providing a lower-cost alternative. And the unelaborated claim that NicSand provided better service to the retailer' — an allegation that could be made in any case, even one involving pure commodities — does not alone demonstrate that “competition itself was harmed.”
Even aside from Indeck, the majority maintains that “a series of exclusive dealing contracts may be anticompetitive” because the “distributors, in agreeing to the terms of such contracts, may fall victim to a collective action problem.” Maj. Op. at 544. In its view, this collective action problem' — -that no retailer will accept the higher prices of one supplier in order to keep competition in the supply market when all the other retailers are accepting lower prices from a potentially emergent monopolist supplier — “justifies competitor standing in exclusive dealing cases.” Id. at 550.
What we have here, however, is not a “collective action problem” but collective-action sanity. If all that one can say about a supplier is that it has offered lower prices (though not predatory prices) to a series of retailers, and that the existing monopolist refuses to match those prices, a retailer would have far more questions to answer for refusing, than for accepting, this better deal. The entities with power in this market by the terms of NicSand’s complaint were not the suppliers but the retailers. It was these retailers after all who initially demanded exclusivity in the market for automotive sandpaper, only reviewing their choice of a single supplier once a year. That they have now signed longer exclusive agreements for much better prices not only does not establish a market failure but shows the retailers’ bargaining authority at work, to say nothing of adherence to their duties to consumers and shareholders. Why not enter a multi-year contract for a steep discount on the prices that NicSand was charging? That helps the retailers and bodes well for consumers to boot. See Indeck, 250 F.3d at 977 (“No allegation in the complaint indicates in any manner whatsoever how [the retailer] itself was harmed or how other [retailers] suffered by agreeing to [an exclusive] agreement with a lower bidder for such [product].”).
All of this is not to say that no potential competitor may bring an antitrust claim for exclusive dealing. Should 3M use its exclusive contracts and current market dominance in the future to establish unreasonable barriers to entry, a potential competitor might have a legitimate antitrust claim. See Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 42 S.Ct. 360, 66 L.Ed. 653 (1922) (finding an anti *561 trust violation where a dominant market power used exclusive contracts with retailers to create excessively high barriers to prospective entrants). But that does not mean that an entrenched market leader can complain about alleged barriers to entry that were imposed through legitimate competition — the most conspicuous result of which was NicSand’s loss of 40-50% margins, which it apparently needed to stay in business. Nor is this to say that the future competitiveness of the market lacks protection if 3M chooses to impose monopolist prices down the road. Aggrieved retailers would have standing to sue for treble damages if that occurred. See Indeck, 250 F.3d at 977 (“[A]s the direct victim of the alleged antitrust violation in this regard, [the retailer] could prosecute its own cause of action should it deem the actions of [the supplier] inappropriate.”).
But, at this point, to allow this litigation to continue is to allow one monopolist to sue a competitor for seizing its market position by charging less for its goods. In Indeck, we concluded that “[t]he record in this appeal presents no indication that competition itself was harmed by any act of the defendants. Consequently, the antitrust damages alleged by Indeck are too indirect and speculative to justify assertion of federal antitrust jurisdiction over this matter.” 250 F.3d at 977. The same is true here. NicSand took advantage of the very same exclusivity it now attacks to charge prices that made it vulnerable to 3M’s offers in the first place. If and when 3M does the same, it will expose itself either to competition (much like NicSand) or to a legitimate antitrust complaint from retailers or excluded competitors. But until then, as the district court rightly concluded, there has been no antitrust injury and NicSand has no antitrust standing to bring this case. The majority seeing these issues differently, I respectfully dissent.